Filed 6/17/14

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| JOCELYN HERNANDEZ, a Minor, etc., | B243294 (Consolidated with B244202) |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. Nos. BC448204, BC456707 & BC456884) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEALS from the judgments of the Superior Court of Los Angeles County, Michelle Rosenblatt, Judge.  Reversed and remanded.

Greene, Broillet & Wheeler, Bruce A. Broillet, Scott H. Carr, Alan Van Gelder; Esner, Chang & Boyer, Stuart B. Esner, Holly N. Boyer and Andrew N. Chang for Plaintiff and Appellant.

Collins Collins Muir & Stewart, Brian K. Stewart, Melinda W. Ebelhar, Catherine M. Mathers and Erin R. Dunkerly for Defendant and Appellant.

_____

Randy Hernandez was standing near his car after an accident on the freeway when he was struck and killed by a Los Angeles County Sheriff's car. [1] Randy's minor daughter Jocelyn Hernandez, through her guardian ad litem Debbie Castaneda, brought a negligence action against the County of Los Angeles. The trial court concluded evidence of Randy's marijuana use was relevant to assess fault attributable to Randy. The jury returned a verdict in favor of Jocelyn, but apportioned 14 percent of the fault to Randy for the accident. Jocelyn contends in her appeal from the judgment that the trial court erred by admitting evidence of Randy's marijuana use when there was no evidence the marijuana use contributed to the accident. We conclude evidence of marijuana use is irrelevant in the absence of a causal connection between the marijuana use and the accident. Admission of the evidence was prejudicial, because it is reasonably probable the allocation of fault for Randy's death would have been more favorable to Jocelyn if the marijuana evidence had been excluded. We therefore reverse the judgment and remand for a new trial. Our resolution of Jocelyn's appeal renders moot the County's appeal from postjudgment awards of sanctions and costs.

## FACTS AND PROCEDURAL HISTORY

**Undisputed Facts**

Randy was 20 years old and lived with his mother. He regularly took care of two-year-old Jocelyn, who lived with her mother Castaneda. He worked as a baggage handler at Los Angeles International Airport. In the early morning hours on Sunday, February 28, 2010, he left the house in his Land Rover to drive to work.

At approximately 5:40 a.m., Eric Lauderdale was driving a silver Cadillac in the fast lane of the southbound 110 freeway when his car got a flat tire. Lauderdale slowed

---

[1] Because the appellant and the decedent share the last name Hernandez, they will be referred to individually by their first names for clarity. No disrespect is intended.

down rapidly and started to move to the right, but worried about damaging the new rim on his tire. While he called a friend, Lauderdale either stopped the Cadillac straddling two lanes or continued to merge right very slowly.

Randy was driving behind the Cadillac on the southbound 110 freeway. The right rear side of Lauderdale's Cadillac and the left front side of Randy's Land Rover collided. The Land Rover spun and came to a stop in the fast lane in front of the Cadillac, facing the Cadillac and oncoming traffic, with its headlights on. Both cars were disabled in the fast lane. The speed limit for this section of the freeway is 55 miles per hour. There is a five-foot concrete barrier next to the fast lane, which is taller than typical freeway barriers.

Randy called 911. He reported being in an accident on the 101 freeway south, in front of Staples Center. The dispatcher noted the 101 freeway is not near Staples Center. Randy paused and said that he meant the 110 south. He said his car was not blocking traffic and added that the cars were stuck in one lane. The dispatcher asked, "So, you are blocking traffic?" He disagreed, "No, I'm not, ma'am." He provided the color and brand of his car. Randy said the other car had been parked in the lane, so he did not see it. He tried to swerve out of the way, but still hit it on the side. The dispatcher said she would send the California Highway Patrol (CHP) to assist him. She added, "Don't walk in the traffic lanes. Take all precautions for your safety. They'll be out there as soon as they can." Randy called his mother to say he had been in an accident, but was not hurt. He told her not to come to the scene, because he did not want her to get hurt.

Lauderdale turned on his hazard lights and got out of his car immediately. He did not feel safe in the car and wanted to check on the driver of the other car. He went to the passenger side window of the Land Rover to talk to Randy. Randy was unhurt. He did not seem to have hit his head and was not acting unusual in any way. Randy spoke intelligently and suggested they should wait for the police. They made small talk and Randy offered Lauderdale a soda while they waited for help. A passing car caused heavy debris in the second lane to fly up and hit the Land Rover. When the debris hit the car, it scared both of them. Randy said, "Fuck this, I'm getting out!" Randy climbed over and

exited through the passenger side door. Randy and Lauderdale stood near the Land Rover. They stood either in front of the Land Rover's headlights, between the disabled cars, or they stood near the back of the Land Rover, between the car and the concrete barrier.

Los Angeles County Sheriff's Deputy Ted Broadston was driving a Crown Victoria in the fast lane. He never saw the Cadillac or the headlights from the Land Rover beyond it. He hit the Cadillac at full speed. The Crown Victoria glanced to the left, hit the barrier, and traveled along the barrier. It went between the barrier and the Land Rover without ever hitting the Land Rover. It came to a stop in the fast lane past the Land Rover and up against the barrier. Lauderdale heard the engine of the Crown Victoria before he saw it hit his car. The Crown Victoria struck him and Randy. Lauderdale's body went over the concrete barrier and his foot was injured. Randy was killed.

Broadston called his dispatcher to report the collision. Lauderdale approached and told Broadston that someone was hurt. Broadston exited the Crown Victoria and immediately began cardio-pulmonary resuscitation (CPR) on Randy.

CHP Officer Frank Marin was driving to work in his Nissan truck when he came upon the accident. Driving 55 to 60 miles per hour in the fast lane, he saw the Cadillac approximately 10 feet in front of him. He steered to avoid it, but he believes he hit it, based on the noise he heard. He tried to avoid debris in the adjacent lane. He came to a stop in the fast lane and backed up. Marin took over CPR on Randy until another deputy arrived and took over CPR. Marin found Lauderdale near his car and asked about the accident. Lauderdale explained he had a flat tire and stopped his car, rather than move to the right shoulder, because he did not want to ruin his tire rim.

A CHP unit with two officers driving 65 or 70 miles per hour in the right lane could not stop in time to assist. One of the officers noticed a man standing by the accident waving his arms. He used his loudspeaker to announce, "Get back in your car. We're going to come around." The officer called in a four-vehicle accident on the southbound 110 and asked the dispatcher to "roll another unit" because they had

"overshot." He also asked if there were any units that could run a break, because they were blocking lanes and traffic was "coming in hot." They exited the freeway, drove back and ran the traffic break.

## Complaint, Motion in Limine, and Opening Statements

In October 2010, Jocelyn brought the instant action for negligence against Broadston and the County. She filed a motion in limine to exclude evidence of her father's use of medical marijuana. She argued the County could not show Randy was impaired by marijuana at the time of the accident or establish any causal connection between his marijuana use and his death. Therefore, the fact he had used marijuana was irrelevant. Any claim that marijuana use was a factor in his death was speculation. She argued it was impermissible character evidence that would prejudice the jury against Randy, confuse the jury, and waste time.

In opposition to the motion in limine, the County argued Randy's marijuana use was highly probative evidence. His use of marijuana directly pertained to the causation of his injuries, from his operation of his car to his decision to stand on the freeway. Randy's impairment due to the influence of marijuana was a highly likely contributing factor to the accident.

In reply, Jocelyn submitted deposition testimony from the County's expert forensic toxicologist Vina Spiehler. Spiehler explained there is no per se level of marijuana in the blood which is considered unlawful or establishes intoxication under California law as there is with alcohol. No per se limit can be set, because the level of marijuana in the blood does not correlate to effects on a person as it does with alcohol.

The trial court concluded evidence of whether Randy was impaired and whether Randy's impairment contributed to the collisions or his actions was relevant. For example, the evidence of marijuana use was relevant to assess his driving prior to the first incident or his ability to follow instructions from the 911 operator. The court denied the motion to exclude evidence of marijuana use.

5

In opening statements, Jocelyn's attorney told the jury the evidence would show Broadston was not paying attention, going too fast, or both, and Broadston's excuse that Staples Center's sign interfered with his vision was not plausible. The County's attorney told the jury the tragedy could have been avoided if Lauderdale had moved out of the fast lane or Randy had stayed in his car. Broadston was driving 55 or 60 miles per hour, noticed a billboard in his peripheral vision seemed unusually bright, and never saw the cars in the road. The County's expert would explain the level of marijuana in Randy's system and testify that Randy's judgment was impaired at the time of the collision. The County's attorney concluded the issue was whether Randy should have been in his car, and using their common sense, the jurors would find he should have remained in the car.

**Trial Testimony and Closing Statements**

Broadston testified that he was driving between 55 and 60 miles per hour at the time of the accident. A tow truck driver who passed the accident right after it happened also testified. He saw the Cadillac's flashing lights, but driving 55 to 60 miles per hour, he could not pull over in time to assist. He pulled over farther down the road, called the CHP, and turned on his flashing lights to alert motorists. He saw Lauderdale get out of his car to approach the Land Rover. He did not see Randy get out of his car. Cars slowed and changed lanes to move around the accident. The Crown Victoria approached at a rate of speed faster than the other cars. The tow truck driver saw Lauderdale jump the center divider to the northbound side of the freeway and he saw an object fly up in the air.

CHP Officer Vogdan Vysochin responded to the accident and spoke with Lauderdale in the hospital. Lauderdale said when his car got the flat tire, he called his friend. While on the call, he slowed down quickly and tried to move to the right. Lauderdale told Vysochin the Land Rover came out of nowhere on his right, traveling 55 to 65 miles per hour, and hit him. Vysochin also interviewed Broadston. Broadston told Vysochin he saw an obstacle, tried to move around it, and hit the center divider. When

Vysochin asked about visual obstructions, Broadston said Staples Center's electronic billboard was extremely bright, but he was unsure whether the bright light was a factor in the collision.

Lauderdale's deposition was taken shortly before trial. Lauderdale said he stopped his car straddling two lanes. He was nervous and not paying attention to other cars. While he was calling his friend, he was hit by the Land Rover in the right rear. After Randy got out, they were standing in front of Randy's headlights, between the disabled cars. They were facing each other, east and west. They did not walk across the freeway, because cars were passing and it was dark. About five cars swerved in order to avoid hitting the Cadillac. Lauderdale heard a loud engine coming toward them. He saw the Crown Victoria as it was hitting his car. Lauderdale yelled to Randy to get out of the way. The car struck Lauderdale's car, then Lauderdale and Randy. When Lauderdale was struck by the car, he was propelled over the barrier. He found himself on the other side of the freeway. He was dazed, but honking from cars made him alert. He climbed back over the barrier. He did not realize it, but his ankle was shattered. His car was smashed against the barrier. The Land Rover had not been hit at all.

Accident reconstruction expert Robert Caldwell testified Lauderdale could not have been stopped when the Land Rover hit the Cadillac, because of the location of the tire marks. Randy's tire marks came out of the fast lane. If the Cadillac had been parked as Lauderdale described, rather than moving to the right, Randy would not have hit it. In Caldwell's opinion, the Cadillac was traveling at approximately 17 miles per hour, Randy was traveling at 72 miles per hour, and Broadston was traveling at 82 miles per hour. In Caldwell's opinion, the Crown Victoria's high rate of speed and Broadston's failure to stay alert caused Randy's death. Caldwell agreed that if Randy had stayed in his car, he would be alive.

Defense accident reconstruction expert Keith Miller also testified that the Cadillac was moving when it collided with the Land Rover, based on the distance the Cadillac traveled after the impact. He estimated the Cadillac was traveling between 20 and 35 miles per hour when it hit the Land Rover. In his opinion, the Cadillac moved into the

7

Land Rover, based on the points of contact on the cars and the fact that the headlights continued to work on the Land Rover.  Miller agreed that Randy would have lived if he had stayed in his car.  However, Miller had no opinion whether marijuana was a factor in the incident.

Castaneda testified that Randy provided approximately $300 per month for Jocelyn's needs and bought extra items for her, like diapers.  Randy's mother testified through an interpreter that Randy went to a doctor for his lower back pain.  She had said in her deposition that he did not see a doctor.   Asked again if he saw a doctor for his back pain, Randy's mother clarified that he did not see a doctor, but had "therapist massages."  She went with him to get a medical marijuana certificate for his back pain. He took the marijuana at night, depending on his pain level.

Medical toxicology expert Donald Barceloux testified.  The level of the active ingredient of marijuana found in Randy's heart during the autopsy was extremely low.  It was barely within the ability of the test to measure.   In addition, the amount of the inactive metabolite measured in the autopsy was higher than it would have been at the time of the accident, because concentrations that have built up in the tissues over time are released as the tissues break down postmortem.

In Barceloux's opinion, the level of active marijuana ingredient detected in Randy's blood was consistent with having ingested marijuana between 10:00 p.m. and 12:30 a.m. the night before the accident.  The main effects from marijuana occur in the first one to two hours.  Most of the effects would have worn off within three to four hours.  In Barceloux's opinion, Randy's driving skills would have been normal within three to four hours after using marijuana.  Based on the 911 call that Randy made, his executive function was good.  He called his mother and reacted with appropriate concern for her safety.  Most people who are impaired do not call the police to come to the scene. Randy was respectful and acted appropriately with Lauderdale.  In Barceloux's opinion, Randy was not under the influence of marijuana at the time of the accident and marijuana did not affect his behavior at all at the time of the incident.

Barceloux stated the opinions of the County's expert Spiehler were flawed, because she relied on a model that does not account for postmortem redistribution. The fact that marijuana is detectable does not mean Randy was impaired or under the influence of marijuana. Barceloux admitted the study he relied on used less potent marijuana samples than marijuana on the current market and the concentration affects the results.

Spiehler testified that in her opinion, Randy was under the influence of marijuana at the time of his death. Marijuana is not stable and dissipates after death, but the autopsy performed a few days after Randy's death showed he still had the active ingredient in the blood in his heart. Based on the presence of the active ingredient, she concluded the amount must have been higher prior to the accident and Randy had used it recently enough to be impaired at the time of his death. She also testified that the level was well within the measurable amount for the test.

Spiehler concluded Randy used medical marijuana approximately five to six hours before his death. The model she relied upon suggested a wide range of times in which Randy could have taken the marijuana based on the ratio of the active ingredient and the metabolite in Randy's blood, but she agreed with Barceloux's concern that the model was based on living participants. Therefore, Spiehler accepted the conclusion that Randy used medical marijuana the night before the accident, because it was within the range provided by the model and consistent with his mother's testimony.

Spiehler explained that Randy's brain would have been slowed down. Marijuana slows down the user's thinking, and affects judgment and perception reaction time. The effects of marijuana increase over time, even as the amount of the active ingredient in the blood level drops, because it is going into the brain.

Spiehler could not quantify the level of impairment that Randy was experiencing at the time of the accident. The level measured in his blood could not be related to an alcohol level. Spiehler did not do any accident reconstruction, so she could not form an opinion that the marijuana Randy used caused the accident. Although Spiehler could say where Randy was in the ranges and effects, Spiehler could not say that Randy would not

have died if he was not impaired. She disagreed with Barceloux's opinion that Randy's level of the active ingredient was so low that it would not have an effect on his driving. She could not say that the marijuana Randy used the night before caused his death the next morning or that being under the influence caused his death.

She had listened to Randy's 911 call. She perceived him as confused and very calm for someone who had just been in an accident. Spiehler said his confusion was consistent with someone under the effect of marijuana, although it was not the only reason he might be confused. She also felt his rate of speech was slow and the operator had to prompt him. However, she agreed Randy spoke clearly in a normal tone of voice. She explained that Randy was not excited, upset or speaking quickly, as would be seen with other types of drugs. It could have been his natural speech or he could have been slowed down by marijuana.

In the instructions on negligence, the trial court included, "A person is not necessarily negligent just because he or she used drugs. However, people who take drugs must act just as carefully as those who do not."

During closing argument, Jocelyn's attorney argued that Broadston was either going too fast and not paying attention, or he was going slow enough but not paying attention, and either way, he was liable for negligence. Jocelyn's attorney reminded the jurors that they had to apply the law as stated by the court and not as they might think it should be, particularly with respect to Randy's marijuana use. He suggested the County introduced evidence of Randy's marijuana use to make him look bad to people who disapproved. He reminded the jurors, ". . . if you don't favor marijuana usage, you can't use that[,] because they've got to prove that usage of marijuana somehow links up to this incident. And they couldn't prove it. So it was like sitting there for you to consider, but in the end there's really nothing to consider about it. So don't use it against him." Jocelyn's attorney reiterated later that marijuana use is controversial, but the jurors had to put aside the controversy and decide whether marijuana had anything to do with Randy's death. He mentioned the autopsy results and noted the active ingredient was barely above the limits of detection.

10

Jocelyn's attorney reviewed the verdict form and discussed Randy's negligence. He noted Randy's estimated speed was 72 miles per hour. "If you believe that, that's negligent on his part because he was going above the speed limit[,] but not nearly as high and as dangerously as Deputy Broadston[,] but he was. So if you believe that he deserves a yes to that question, I will leave that up to you all." He added, "If you think he was negligent because he got out of the vehicle when he thought he was protecting himself, if you think that he shares some responsibility before of that, you can also answer that yes. I heard the evidence too. You can make your own decision on that." Jocelyn's attorney pointed out that even if Randy had acted negligently, the jury still needed to decide whether the negligence was a cause of his death. He emphasized that Randy was not killed in the first collision, but in the second.

Jocelyn's attorney also reviewed the concept of noneconomic damages, Randy's life expectancy, and future events that Jocelyn would not experience with her father. He suggested the jury might select $500,000 or $1 million per year for the next 15 years of Jocelyn's life.

The County's attorney argued Randy was traveling 72 miles per hour when he came upon a parked or slowly moving vehicle and slammed into the back of it. Randy did not see it in time. The 911 operator told Randy not to walk in the traffic lanes, but then according to Lauderdale's testimony, they stood in front of the Land Rover to be illuminated. Therefore, they were in a traffic lane when the accident happened. He said all the witnesses agreed that if Randy had stayed in the car, he would not have died.

The County's attorney added, "There was evidence of marijuana. You folks are going to do with it what you will. None of our experts could say it caused the problem. Did it contribute to it? I don't know. Think about this. The blood was drawn 50 hours after the incident. And 50 hours is a long time. That's more than two days. Two days [later] and then tested, and those levels are still in the blood. I think that counts for something."

"Marijuana for back problems. I've had a congenital back problem since I was 12 years old. I've had two surgeries, and not once has a doctor ever prescribed marijuana

11

for me. Just hasn't come up. I've gone to orthopedic surgeons. I've gone to chiropractors. I've gone to acupuncturists, massage to my back, all that stuff. See, that's what I have to do. If I exercised, I probably wouldn't have back problems."

"There is competent evidence that he was under the influence. You folks are going to do with it what you will. You can listen to that 911 tape if you want and draw your own conclusions. He sounds confused in there, and to me he sounds a little too calm. If that happened to me, I'd be a little hyper. I'm hyper anyway, but I wouldn't be as relaxed as he seems to be and [sitting] the wrong way in the dark[.] It seems a little chill to me."

The County's attorney suggested if the jury reached the question of damages, $250,000 would provide Jocelyn with an excellent education, including an education at the best universities. An award of $500,000 would provide an excellent education and a house. At some point, he argued, the amount becomes obnoxious.

The County suggested the negligence percentages should be distributed 60 to 70 percent to Lauderdale, who put everyone at risk because he wanted to save his tire rim rather than move off the freeway. Randy should be found 20 to 30 percent responsible. The County's attorney would assign no fault at all to Broadston, but if he had to find some share of the fault was attributable to Broadston, it was in the 10 to 20 percent range.

In rebuttal, Jocelyn's attorney pointed out that Randy did not slam into the back of the Cadillac. Both reconstruction experts said Randy would have missed the Cadillac, except the Cadillac moved into him. Jocelyn's attorney also argued Lauderdale had to be standing right next to the barrier to have had time to jump over it, not in front of the headlights in the traffic lane.

He added, "Marijuana. Even they seem to agree that it really doesn't have any place in this trial. It is medical marijuana. He did have a prescription for it. Maybe no doctor has ever prescribed it for counsel, but let's recognize that it's a fairly recent thing in California to prescribe medical marijuana under the law. But what I do know is this. He didn't deserve to die for it, and Jocelyn didn't deserve to lose her Dad because he had done medical marijuana the night before because of his back problem. Don't hold it

12

against him, and don't hold it against her." He disputed that the jury's award should be to cover the cost of a good college education. In a burning building, between a $10 million painting and an unconscious human being, you would save the human being and let the painting go, because the human being has more worth.

## Deliberations, Verdict and New Trial Motion

During the jury's deliberations, one juror refused to continue, but eventually relented. On April 13, 2012, the jury returned its verdict finding the County, through Broadston, had been negligent, and his negligence was a substantial factor in Randy's death. For the loss of Randy's love, companionship, comfort, care, assistance, protection, affection, society, moral support, training and guidance from February 28, 2010, to the date of the verdict, the jury awarded $50,000 to Jocelyn. For the loss of companionship from the date of the verdict forward, the jury awarded $500,000.

The jury found Randy and Lauderdale were negligent as well, and their negligence was a substantial factor in causing Randy's death. The jury assigned 51 percent of the responsibility for Randy's death to the County, 35 percent to Lauderdale, and 14 percent to Randy. The trial court entered judgment in favor of Jocelyn as against the County, awarding damages of $280,500 and costs to Jocelyn.

Jocelyn filed a motion for a new trial based on the admission of evidence of marijuana use and juror misconduct. In support of the motion, Jocelyn submitted the declaration of the juror who temporarily refused to participate (Juror 1). Juror 1 declared in pertinent part, "A large part of the first full day of deliberations was spent addressing whether or not Deputy Broadston's negligence was a substantial factor in causing Randy Hernandez's death. During the discussion on substantial factor, several jurors kept making reference to Mr. Hernandez's use of medical marijuana. Several jurors stated that they had experience with marijuana and were aware that medical marijuana is more potent than regular marijuana. They also stated they were aware that medical marijuana stayed in the system longer than regular marijuana. Multiple jurors stated that Randy

13

Hernandez was negligent and at fault for having medical marijuana in his system." After the substantial factor issue was resolved, the jury assessed the amount of damages and deliberated over the allocation of fault. Juror 1 declared, "In deciding whether or not Randy Hernandez was negligent multiple jurors again brought up the fact that Randy Hernandez had medical marijuana in his system at the time of his death and that medical marijuana is more potent than regular marijuana based on their experience with marijuana. The jurors stated that Randy Hernandez was under the influence and was negligent because he had medical marijuana in his system." He accused jurors of socioeconomic bias and claimed some jurors were excluded from deliberations.

In opposition to the motion for new trial, the County argued it was not error to admit evidence of marijuana use, because it was probative of Randy's decision to get out of the Land Rover. In addition, there was no prejudice caused by the admission of Randy's use of medical marijuana, which was legally prescribed and no more damaging or prejudicial than if Randy had taken prescription Vicodin before driving. Speculation about error based on the jurors' discussion of marijuana impermissibly invades their subjective deliberations.

In support of the opposition, the County submitted the declaration of Juror 2. Juror 2 stated Juror 1 had accurately described the jurors' discussion of marijuana. He added, ". . . however, we discussed all the evidence which was relevant to Mr. Hernandez's proportion of the negligence. His marijuana use was not a major factor in arriving at the decision of proportions of negligence, although it was one of many factors discussed." Juror 2 also stated, "Mr. Hernandez's use of medical marijuana was not a significant factor in determining who was negligent or to what degree. We discussed all of the evidence presented at trial on the subject of Mr. Hernandez's negligence."

The County also submitted questionnaires completed by the 12 jurors. One question was, "Do you have the opinion that marijuana is dangerous and should not be sold legally in California for medical or [] other purposes?" Six of the jurors on the panel answered yes to this question. Jurors who answered yes were asked to explain their answers. The explanations provided were: (1) "I believe there is a lot of abuse in terms

14

of medical marijuana.  There are too many people that get it for illegitimate reasons."  (2) "It is dangerous in the sense that we have enough DUI [without] marijuana being legal.  Also the 2nd hand smoke is awful to be exposed to.  However, I think turning the active ingredient into a pill [and] using it for medical purposes is okay."  (3) "Marijuana is a drug, just like any other illegal substance.  It affects one's behavior, driving skills, etc., although, it does not cause aggressive or violent behavior."  (4) "[There] is a lot of problems with drug addiction.  Make marijuana [legal] in California[,] we will have more accidents or people driving under the influence."  and (5) "Most of its users unfocus [*sic*]."  One juror did not explain the answer.

In response to a follow-up question, three jurors said they or a close friend or family member had a medical marijuana prescription card.  Juror 1 explained his wife has a medical marijuana license.

At a hearing on the motion for new trial, the trial court sustained objections by the County to the paragraphs of Juror 1's declaration about the jurors' discussion of marijuana on the ground that they did not conform to the requirements of Evidence Code section 1150 and invaded the subjective deliberative process of the jury.

The trial court found Juror 2's declaration more credible on the issue of socioeconomic bias and the participation of the jurors in the deliberative process.  The court found it was appropriate for the jury to discuss the use of marijuana because there was testimony on marijuana and expert testimony about it.  The court concluded its original ruling was correct for the reasons given at that time concerning whether Randy's attentiveness was an issue and whether he should have any liability for any of the acts that occurred.  If the Spiehler testimony was not properly admitted, the court found it was not so prejudicial as to affect the verdict when looking at the percentages of liability attributed to Randy.  The court determined the verdict could have reasonably been a lot higher, but was within the reasonable range of the evidence.  The court denied the motion for new trial.  Jocelyn filed a timely notice of appeal from the judgment.

Jocelyn filed a motion for cost of proof sanctions against the County as to five issues.  The trial court awarded $16,946.62 as the cost of proving one issue:  Broadston's

speed at the time of the accident.  The County filed a motion to tax Jocelyn's costs, including expert fees.  The court found that Jocelyn's exhibit fees were reasonable and necessary to the prosecution of the case and denied the motion to tax costs as to that item.  The County filed a notice of appeal from the postjudgment orders.

**DISCUSSION**

On appeal, Jocelyn contends evidence of Randy's marijuana use was irrelevant.  It constituted inadmissible character evidence, which was far more prejudicial than probative within the meaning of Evidence Code section 352.  She further contends that if marijuana evidence had not been admitted, it is reasonably probable the jury would have reached a result more favorable to her.  We agree.

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210.)  However, even relevant evidence may be excluded under Evidence Code section 352, which provides that the trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate under consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  In general, evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.)  Exclusion of evidence under Evidence Code section 352 is reserved for those cases where the proffered evidence has little evidentiary value and creates an emotional bias against the party.  (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 45.)

We review any ruling by the trial court as to the admissibility of evidence for abuse of discretion.  (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, citing *People v. Alvarez* (1996) 14 Cal.4th 155, 201.)  We do not substitute our judgment for that of the trial court and may grant relief only when the

16

asserted abuse of discretion constitutes a miscarriage of justice.  (*Ajaxo Inc. v. E\*Trade Group Inc.*, *supra*, 135 Cal.App.4th at p. 44.)

The statutory definition of negligence provides, in relevant part, that every person is responsible for an injury occasioned to another by his or her want of ordinary care or skill except so far as the latter has brought the injury upon himself or herself.  (Civ. Code, § 1714, subd.(a).)  The comparative fault doctrine "is designed to permit the trier of fact to consider all relevant criteria in apportioning liability.  The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an "equitable apportionment or allocation of loss."'  [Citation.]"  (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1233, quoting *Knight v. Jewett* (1992) 3 Cal.4th 296, 314.)  Generally, the defendant has the burden of establishing that a percentage of fault is properly attributed to the plaintiff, other defendants, or nonparties to the action.  (See *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476, fn. 11.)  "Under the principles of comparative fault, a person's negligent conduct may be assigned a share of fault greater than zero percent only when the conduct was a substantial factor in the causation of the pertinent injuries.  (*Stewart* [*v. Union Carbide Corp.* (2010)] 190 Cal.App.4th 23[,] 33; *Chakalis v. Elevator Solutions, Inc.* (2012) 205 Cal.App.4th 1557, 1572-1573.)"  (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1287.)

Where the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation.  (*Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1569.)  "The probable effect of intoxicants other than alcohol is a topic 'sufficiently beyond [the] common experience' of most jurors that expert testimony is required.  [Citations.]"  (*Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 374.)

In this case, the County failed to present evidence that Randy's marijuana use was a substantial factor in causing his injuries.  Spiehler could not quantify the level of

17

impairment that Randy was experiencing at the time of the accident, did not form an opinion that the marijuana Randy used caused the accident, and could not say that the marijuana Randy used or being under the influence of marijuana caused his death. If none of the County's experts could say Randy's marijuana use was a substantial factor in causing his death, the jury could not speculate there was a causal connection between Randy's use of marijuana and his death. Therefore, the evidence of marijuana use was irrelevant and should have been excluded. (Cf. *Smith v. Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 763, 771-775 [employer that denied workers' compensation benefits based on employee's intoxication must prove intoxication was a proximate cause or a substantial factor in causing accident, as was shown by expert testimony that judgment and reaction time would be impaired seriously at a blood alcohol level of .25 percent and could have contributed to the accident].)

There was no evidence Randy's marijuana use contributed to the initial collision. Lauderdale was either traveling on the freeway at a very slow rate of speed or was stopped straddling lanes, not for safety reasons, but to avoid damage to his wheel rim. No expert testified Randy could have avoided the Cadillac if not for the effects of marijuana. In fact, one reconstruction expert testified that Randy would have avoided the Cadillac if Lauderdale had not moved into him. The expert opinions were supported by the location of the damage on the right rear side of the Cadillac and the left front side of the Land Rover. Two trained law enforcement professionals collided with the Cadillac after Randy, and witnesses driving in other lanes testified that when they came upon the accident, they were not able to get over in time to assist.

There was also no evidence that the effects of marijuana caused Randy to get out of his car or stand in a particular location. No expert testified that marijuana was a factor in these decisions. Lauderdale felt unsafe and exited his car long before Randy got out of the Land Rover. Randy stayed in his car after the first accident and got out only when flying debris made it seem unsafe to remain in the car. Randy was standing in the path of Broadston's uncontrolled car whether in front of the Land Rover headlights or near the back between the Land Rover and the median. With hindsight, the experts agreed Randy

18

would have been alive if he had stayed in his car. However, this did not mean Randy would have survived any subsequent accident if he had stayed in his car, just this particular accident in the manner that it occurred. The experts in this case could not say the effects of marijuana contributed in any way to Randy's death in this case.

The County's closing argument made it apparent that Randy's marijuana use was not relevant. The County's attorney admitted there was no evidence Randy's marijuana use contributed to his death, but he invited the jury to speculate about the effects of marijuana anyway.

Because the experts could not identify any manner in which marijuana use contributed to the accident that injured Randy or his decision to exit the Land Rover, the evidence was not relevant to the issues and had no probative value. Even if the presence of marijuana in Randy's blood had some minimal probative value, the danger of undue prejudice was substantial. The conflicting evidence about marijuana use confused the issues for the jury and encouraged them to speculate whether marijuana use was a factor in the accident in some way, when there was no evidence to support causation. The County's attorney even used the marijuana evidence to suggest that Randy might not have had a legitimate medical need for marijuana or that marijuana was not a legitimate treatment option. This was impermissible character evidence that had nothing to do with negligent actions on the morning that Randy was killed, because Randy's character was not at issue.

A judgment will not be set aside based on the erroneous admission of evidence unless "the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.] Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant. [Citations.]" (*Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853-854.)

We conclude it is reasonably probable that a result more favorable to Jocelyn would have been reached if the evidence of marijuana use had been excluded. The jury assigned only 20 percent more responsibility for the accident to Lauderdale than Randy,

even though Lauderdale either parked his car on the freeway to prevent damage to his wheel rim or hit Randy's car while Randy was trying to avoid him, then got out of his car right away and stood talking with Randy. In the absence of speculation about the use and effects of marijuana, particularly when jury questionnaires showed six of the jurors fundamentally disagreed with the medical marijuana laws, it is unlikely the jury would have attributed 14 percent of the fault to Randy for his injuries.

None of the cases relied on by the County directly considered whether evidence of drug use is admissible without evidence of causation. (*Brkljaca v. Ross* (1923) 60 Cal.App. 431; *Lawrence v. City of Los Angeles* (1942) 53 Cal.App.2d 6; *Emery v. Los Angeles Ry. Corp.* (1943) 61 Cal.App.2d 455; *Cloud v. Market Street Ry. Co.* (1946) 74 Cal.App.2d 92; *Barr v. Scott* (1955) 134 Cal.App.2d 823.) These cases concerned alcohol, which is available for adults to purchase without a prescription, and did not necessarily require expert testimony as to the probable effects. Unlike alcohol, medical marijuana is not generally available for purchase by the public and expert testimony is required to show the effects of marijuana. Authorities in other jurisdictions have concluded drug evidence is not relevant or is more prejudicial than probative, in the absence of a link between the evidence and the cause of the accident, and that the admission of drug evidence in the absence of causation is prejudicial. (See generally *State v. Ingraham* (Mont. 1998) 966 P.2d 103, 110-112; *Havens v. State* (Mont. 1997) 945 P.2d 941, 943-944; *People v. Phillips* (Mich.Ct.App. 1984) 346 N.W.2d 344, 347-348; *Bell v. State* (Ga. 2006) 629 S.E.2d 213, 218; *Estate of Holznagel v. Cutsinger* (S.D. 2011) 808 N.W.2d 103, 105-106; *Shaw v. Jain* (Fla.Dist.Ct.App. 2005) 914 So.2d 458, 459-461; but see *State v. Clark* (Conn. 2002) 801 A.2d 718, 724-727 [no evidence of marijuana's effect on perception and memory was necessary for jury to consider effect of smoking five marijuana cigarettes shortly before incident].)

As stated above, there is no evidence in this case of a causal connection between Randy's marijuana use and his death the next day. The evidence of drug use was substantially more prejudicial than probative, and it is reasonably probable the judgment would have been more favorable to Jocelyn in the absence of the evidence about Randy's

20

use of marijuana.  The judgment in this case must be reversed for a new trial.  As a result of the disposition of the case, the County's appeal from postjudgment orders must be dismissed as moot.

## DISPOSITION

The judgment is reversed and remanded for a new trial.  Jocelyn Hernandez is awarded her costs on appeal.  The appeal filed by the County of Los Angeles from postjudgment orders is dismissed as moot.


KRIEGLER, J.

We concur:


MOSK, Acting P. J.


MINK, J.[*]

---

[*] Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.