Filed 4/23/21  Modified and Certified for Pub. 5/14/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL O'SHEA, | |
| Plaintiff and Appellant, | G058997 |
| v. | (Super. Ct. No. 30-2018-00977055) |
| SUSAN F. LINDENBERG et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Frederick Paul Horn, Judge.  (Retired judge of Orange County Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

MLG, Jonathan A. Michaels, Kyle Gurwell, Robert Grijalba, Robert B. Smith and Afnan Shukry for Plaintiff and Appellant.

Ropers Majeski, Terry Anastassiou, Andrew S. Hollins and Michael T. Ohira for Defendants and Respondents.

\*          \*          \*

This is a legal malpractice case. Plaintiff Michael O'Shea hired attorney Susan F. Lindenberg to represent him in a child support action. After O'Shea's ex-wife was awarded what he believed to be an excessive amount of child support, he filed this action. His most significant allegation of negligence was that Lindenberg should have retained a forensic accountant. The case went to trial and the jury concluded, in a special verdict, that Lindenberg owed a professional duty of care that she breached. The jury was unable to agree, however, on whether the breach of duty caused him damage, and the judge declared a mistrial.

Lindenberg moved for a directed verdict on the grounds that the evidence presented at trial did not support a finding of causation, specifically, that without the alleged malpractice, O'Shea would have received a better result. The trial court agreed and directed a verdict in Lindenberg's favor. After reviewing the evidence in accordance with the applicable standard of review, we find O'Shea failed to present sufficient testimony on the issue of causation, and therefore we affirm the judgment.

I

FACTS

*The Underlying Child Support Matter*

O'Shea and Tauna Vandeweghe married in 2000 and had two children together, born in 2001 and 2003, respectively. After separating in 2007, Vandeweghe filed for divorce in New Jersey in July 2014. She also filed a custody and support action in Orange County shortly thereafter.[1] O'Shea was originally represented by Kevin Mooney of Minyard and Morris. According to O'Shea, the major issue in both the

---

[1] Presumably, although it is not clear from the parties' briefs, Vandeweghe relocated to California with the children during the separation. O'Shea remained a resident of New Jersey. Unless otherwise indicated, all family court actions refer to the Orange County custody and support action.

divorce and child support cases was his finances, which he characterized as "complicated" due to structure of one of his businesses, Crest Health Management, LLC (CHM). Additionally, he was a 20 percent partner in a business known as Red Bank Atlantic Club (Red Bank). He also had other sources of income he claims were not available for support.

While represented by Mooney, O'Shea filed the mandatory income and expense declaration (the September I&E) and his formal response to the request for a support and custody order. The September I&E stated his average monthly income, based on his 2013 tax returns and from all sources, was $11,749 with expenses of $9,789. He also claimed cash assets of $23,346 and personal and real property of $107,930.

A hearing was set for September but was continued until February 10, 2015. In October 2014, O'Shea stipulated to paying $2,500 per month in child support while the matter was pending. At some point before the February hearing, Mooney exited the case and O'Shea began representing himself.

On February 10, 2015, O'Shea called Lindenberg, a certified family law specialist, for the first time, stating he had a hearing that afternoon and wanted a lawyer to appear for him. She agreed to make a special appearance, and she sought and received a continuance until April on permanent custody and support. (The family court later, on its own motion, continued the hearing until July.) O'Shea subsequently retained Lindenberg to represent him.

Lindenberg testified at trial in this matter that on February 10, 2015, she recommended to O'Shea that he retain a forensic accountant to explain his finances to the court, but O'Shea declined, stating he was already paying for a forensic accountant in the New Jersey dissolution case. O'Shea denied Lindenberg made this recommendation.

At the February hearing in the family court matter, the parties were permitted to provide additional documents and proposed child support. Lindenberg

3

prepared and submitted a new income and expense declaration (the February I&E), which O'Shea signed.

The February I&E was substantially different from the September I&E, stating O'Shea had only disability and social security income totaling about $3,929 per month, and no business income, with total expenses increasing to $11,216. He claimed assets of $43,362 in cash and $197,000 in personal and real property. In an addendum, he claimed he had suffered financial setbacks due to Hurricane Sandy in 2012, but with no explanation as to why they were not disclosed in the September I&E.

The family court, in determining the issue of temporary support, found the February I&E "perplexing," noting, that despite being a 50 percent partner in CHM and a 20 percent partner in Red Bank, the businesses "generate[d] zero income." The February I&E, the court stated, asserted that O'Shea had been selling assets, borrowing money, and relying on credit cards to pay his own expenses, Vandeweghe's, and the children's. The court noted the differences in the September I&E, including the business income, the differences in cash and personal property, and the lack of any attachments that discussed his business or his alleged financial problems due to Hurricane Sandy.

The court considered both declarations: "ln comparing the 2014 and 2015 Income and Expense Declarations, the following facts become obvious. [O'Shea's] cash on hand has risen $20,000. His personal and real property value has risen $85,000. His outstanding debts have fallen $188,000. Stated differently, over the past six months, [O'Shea's] net worth has increased $293,000, an average of $48,800 per month, while at the same time his expenses have been at $11,300 per month and he has paid child support of $2,500 per month. Even if we only looked at the Social Security money he receives each month, and add the [Red Bank] 2013 distribution of $53,732 shown at $4,477 per month, his monthly income is, at a minimum, $8,574."

Further, the family court found that O'Shea "wants the court to believe that Hurricane Sandy [in October 2012] damaged the financial viability of his

4

business/businesses, and that the Affordable Care Act has all but destroyed it. In his September 2014 Income and Expense Declaration, [O'Shea] acknowledges that within the prior 12 months be had averaged $9,583 in income from those businesses. The 12-month period would have started a year after Hurricane Sandy came. So, it seems unlikely that that storm was the cause of any loss in income. And the Affordable Care Act has only begun. It also seems unlikely that a universal health insurance government program would cause the destruction of a health care business such as one providing physical therapy. Evidence may come to light supporting [O'Shea's] viewpoint, but at this point the argument seems unsupportable."

Taken together, the family court found that the I&E's gave "but a limited view" of O'Shea's finances, finding his claim that he was living on the generosity of friends to be "hollow." The court found O'Shea's income, for purposes of temporary support, to be $20,000.

Neither party's brief provides a detailed account of what followed, but in August 2016, the family court issued its final order on support. In advance of trial, O'Shea submitted two new I&E declarations. The court characterized these as "more cautious and less helpful in determining income or net worth," and as a result, the court gave them little weight. The court also found O'Shea was "not credible." O'Shea claimed to have no income other than social security and $1,250 per month from CHM, and that he was constantly having to borrow money from friends and live on his retirement accounts. The court found this "not consistent with the documentary evidence." When pressed on what a particular check was for, O'Shea claimed a lack of knowledge or hazy recall. The court was also not persuaded of O'Shea's other claims about his business dealings, which included buying and selling expensive war memorabilia as well as his more formal business activities. The court stated O'Shea's evidentiary brief "comprehensively details many of the discrepancies." While the court acknowledged O'Shea's income available for support varied from year to year, and did

5

not consider one-time sources of income, it nonetheless found "a substantial amount of unexplained passive income based on the records . . . disclose[d]."

In sum, after considering the evidence submitted by the parties and documents from the New Jersey proceedings, the family court found O'Shea's average monthly income available for support to be $60,000, ultimately resulting in an award of approximately $8,373 per month from 2017 forward. The court awarded attorney fees to Vandeweghe of $135,000 and sanctions against O'Shea of $15,000. The sanctions were justified, the court stated, because Vandeweghe had "shown that much of [O'Shea's] income, assets, and liabilities ha[d] not been disclosed." Further, O'Shea had failed to answer appropriate discovery requests.

Lindenberg and O'Shea's attorney-client relationship ended in March 2017, with attorney Brian Saylin substituting in as counsel. Thereafter, O'Shea and Vandeweghe agreed upon a settlement that reduced O'Shea's obligations by approximately 23 percent.

*The Instant Case*

In March 2018, O'Shea filed the instant case. His first amended complaint (the complaint) alleged professional negligence and violations of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.).[2] Lindenberg filed an answer.

The case went to trial beginning in January 2020. We will discuss the relevant testimony as necessary in our discussion, but the jury ultimately decided Lindenberg had a duty of care to O'Shea and breached it. The jury, however, was unable to agree on whether the breach of duty was a substantial factor in O'Shea's alleged damages. Accordingly, the court declared a mistrial.

---

[2] The fate of the Consumer Legal Remedies Act cause of action is unclear, but neither party raises any issue relating to it in this appeal.

Lindenberg moved for a directed verdict, arguing that no evidence was presented establishing the element of causation in the professional negligence claim. O'Shea argued the testimony established otherwise.

The family court agreed with Lindenberg, stating "we had no indication of what the different result would have been." While O'Shea presented testimony his income was $6,000 per month rather than $60,000, "[w]e don't really know that [the court] would have made a different result. What we do know . . . [the court] was disenchanted with [O'Shea], and I think that makes it, perhaps, harder for the plaintiff to show that an extra minute of cross-examination or something else would have changed . . . the result when . . . to the extent [the court] expressed opinions about, let's say, intermediate steps along the way, they were very harsh upon [O'Shea]. And so saying that the ultimate result would have been different isn't supported by any evidence. [¶] The only evidence we have arguably is that those intermediate steps, the building blocks of [the court]'s decision-making process, were not favorable to [O'Shea]. I think the motion has to be granted."

O'Shea now appeals.


II

DISCUSSION

*Legal Standard for Granting Directed Verdict and Standard of Review*

The statutory authority for granting a directed verdict after a mistrial is Code of Civil Procedure section 630, subdivision (f): "When the jury for any reason has been discharged without having rendered a verdict, the court on its own motion or upon motion of a party . . . may order judgment to be entered in favor of a party whenever a motion for directed verdict for that party should have been granted had a previous motion been made."

7

A motion for a directed verdict, like its close cousins the motion for nonsuit and motion for judgment notwithstanding the verdict, may be granted when "the court . . . determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630.) "The function of these motions is to prevent the moving defendant from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750.)

We review the trial court's decision de novo. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) The rules for reviewing a directed verdict are fairly strict. "'A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom."'" (*Ibid.*) "'"In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . ."'" (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521.)

As for the relevant requirements in a legal malpractice case, the plaintiff must generally establish "(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199-1200.) Causation in a professional malpractice context means establishing by a preponderance of the evidence that, but for the negligence, "the plaintiff would have obtained a more favorable

judgment or settlement in the action in which the malpractice allegedly occurred. The purpose of this requirement, which has been in use for more than 120 years, is to safeguard against speculative and conjectural claims." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241.)

For purposes of determining whether a more favorable outcome would have been obtained, the object of the exercise is not to "'recreate what a particular judge or fact finder would have done. Rather, the [finder of fact's] task is to determine what a reasonable judge or fact finder would have done . . . .'" (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 840.)

*Relevant Breaches of Duty*

As noted *ante*, the jury found that Lindenberg breached her professional duty to O'Shea, but we have no indication as to precisely what facts the jury used to reach that conclusion.

O'Shea's brief lists no less than seven purported breaches of duty: 1) the failure to advise O'Shea to retain a forensic accountant; 2) the failure to advise O'Shea of the consequences of not obtaining a forensic accountant; 3) the failure to obtain informed written consent to forego hiring a forensic accountant; 4) failing to examine a crucial witness for more than four minutes; 5) allowing O'Shea to testify by telephone; 6) failing to notify O'Shea about the need to explain inconsistencies in the I&E declarations; and 7) failing to "explain apparent instances of forgery." (Capitalization omitted.)

While O'Shea's expert testified at length on the first three issues, those relating to the forensic accountant, he did not offer an opinion about any of the other issues. Indeed, O'Shea's counsel informed the family court that all questions to the legal malpractice expert "are going to relate to the forensic accountant."

The general rule is that expert evidence is required to establish legal malpractice. (*Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229,

9

1239; *Wilkinson v. Rives* (1981) 116 Cal.App.3d 641, 647-648.) The need for expert testimony has particular force where the attorney, as here, holds himself or herself out as a specialist: "Where . . . the malpractice action is brought against an attorney holding [him or herself] out as a legal specialist and the claim . . . is related to [his or her] expertise as such, then only a person knowledgeable in the specialty can define the applicable duty of care and opine whether it was met." (*Wright v. Williams* (1975) 47 Cal.App.3d 802, 810-811.)

There is an exception when the alleged malpractice is so utterly egregious and obvious that no expert testimony is needed. *Goebel v. Lauderdale* (1989) 214 Cal.App.3d 1502, is a leading contemporary case recognizing this exception.[3] There, a bankruptcy attorney—but one who, nonetheless, still "handle[d] other legal matters"— specifically advised a contractor to collect $15,000 from a job on which he was working even though he himself owed the laborers and material suppliers, and then stop work on the project. The contractor followed the advice and within about a month filed for bankruptcy. (*Id.* at p. 1505.) But there was a substantial problem with the attorney's advice—it constituted a felony under Penal Code section 484b. When the contractor was prosecuted, he sued the attorney for legal malpractice. The contractor's expert witness was not a bankruptcy specialist and could not testify about attorneys as a general matter. In reversing a subsequent nonsuit, the appellate court said the malpractice was "so clear," or readily obvious from the facts of the case, that no expert was necessary. (*Goebel*, at pp. 1508-1509; see *Wilkinson v. Rives*, *supra*, 116 Cal.App.3d at pp. 647-648; *Wright v. Williams*, *supra*, 47 Cal.App.3d at pp. 810-811.)

---

[3] See *Day v. Rosenthal* (1985) 170 Cal.App.3d 1125, 1146-1147, which used the standard "so clearly contrary to established standards" that a finder of fact could find professional negligence without the testimony of an expert. In that case, the attorney violated numerous Rules of Professional Conduct. (*Id.* at pp. 1147-1149.) The attorney's conduct was not merely negligent, but the type of behavior that could not be condoned in the profession. (*Id.* at p. 1149.)

The case O'Shea repeatedly cites here is another example of this exception, *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070. In that case, the plaintiff (who herself was a bankruptcy attorney) was going through a divorce with a husband who had a VA pension. The plaintiff had also completed a buy-out of her partnership from her previous law firm. Her family law attorney advised her to cede her entire interest in the VA pension as a way to help her stay in her house, despite the fact that even keeping a mere $1 interest in it would have made her eligible for lifetime health insurance "at very low cost." (*Id.* at p. 1083.) The family law attorney also failed to advise her of the "immediate and specific" tax consequences of the partnership buy-out. (*Id.* at p. 1095.) Despite the lack of expert testimony on the standard of care, the appellate court reversed a nonsuit. As to the VA pension, the court stated a "few hours" of research would have shown that even a nominal interest in the pension would have allowed her to keep those "valuable benefits." (*Id.* at pp. 1094-1095.) As to the tax liability, the court stated the lack of research, "coupled" with evidence the family law attorney was "unnecessarily rushing to finalize" a settlement, was enough for the plaintiff's claim to survive the absence of expert testimony. (*Id.* at p. 1095.)

These cases demonstrate a high standard for legal malpractice matters that may bypass the need for expert testimony on the standard of care. This exception only applies to malpractice that is "so clear" as to be unmistakable, or obvious malpractice resulting from an utter failure to undertake "basic research." As a matter of law, neither of those standards applies here to the four issues as to which O'Shea failed to elicit expert testimony. O'Shea cites no authority to cases in which similar acts of purported malpractice did not require expert testimony.

The first two issues, how long to examine a witness and allowing a party to testify by telephone, are tactical decisions governed by myriad considerations, both practical and legal. The second two, regarding the inconsistencies in the I&E

11

declarations and the purported need to explain "apparent forgeries"[4] are judgment calls that qualify as neither unmistakable malpractice or a lack of basic legal research. If O'Shea wished to establish any of these acts constituted a breach of Lindenberg's duty, they required expert testimony on the applicable standard of care.

Accordingly, the only breaches of duty we will consider are the ones related to forensic testimony, which *was* the subject of expert testimony at trial. Given the relevant standard of review which requires us to disregard conflicting testimony, we must assume, for purposes of this appeal, that Lindenberg breached her duty with respect to advising O'Shea about retaining a forensic expert.[5] We focus our attention on whether there was sufficient evidence that breach caused O'Shea's alleged damages.

*Evidence of Causation*

Thus, we are left with the question of whether O'Shea produced legally sufficient evidence to demonstrate that Lindenberg's purported failures with respect to retention of a forensic expert resulted in a worse outcome than he would have otherwise received. He points to a "chain of causation" that he claims demonstrates a "reasonable inference" of causation.

O'Shea relies on the testimony of his forensic accountant, Brian Morton, who testified that during all periods relevant, the average monthly income O'Shea had available for support was $5,906. Morton's analysis was "independent" of the family court's ruling, and did not take into account the court's discretion as to how to treat the validity of numbers submitted as income.

---

[4] The record citations O'Shea provides does not establish that he was accused of "forgery" as a violation of the Penal Code. Altering certain documents would be a more accurate characterization.

[5] Contrary to O'Shea's claim in his reply brief, Lindenberg does not concede this issue.

This "chain of causation" also includes the trial testimony of his legal malpractice expert, Marshal Waller, who testified that if Lindenberg did not advise the retention of a forensic expert, counsel O'Shea as to the consequences of not hiring one, and memorialize that in writing, she had breached her professional duties. He also testified that the amount of child support ultimately awarded depended on the amount of income O'Shea had available for support. Further, he testified that based on Morton's calculations that O'Shea had $5,906 income per month, his child support obligations would have been dramatically lower, and an attorney fee award of zero would have been reasonable.[6] Waller used the difference to quantify $462,156 as the amount he believed O'Shea had "been damaged."

What Waller did not testify to, however, was a direct connection between the lack of a forensic expert and the outcome of the case. When asked, Waller could not testify to a "reasonable degree of legal certainty" that a forensic accountant's involvement would have resulted in different outcome. O'Shea glosses over this lack of expert testimony on causation. But "[w]here the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation." (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1614.)

There is no reasonable question that whether a forensic accountant's testimony would have made a meaningful difference in the outcome of a child support matter is outside the common experience of jurors. The failure to elicit such testimony, indeed, the fact that when asked, Waller could not provide such evidence, leaves O'Shea without sufficient evidence on this critical point.

"'[D]amages may not be based upon sheer speculation or surmise, and the mere possibility or even probability that damage will result from wrongful conduct does

---

[6] Waller also testified that if O'Shea had completely complied with his discovery obligations, the sanctions award would have been zero. As this is unrelated to the issue of Lindenberg's advice on a forensic accountant, we do not consider it.

13

not render it actionable.'" (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1048.)  Finding a breach of a duty is not enough; that breach must also cause harm.  Here, the evidence that Lindenberg's alleged failures with respect to the forensic expert were a substantial factor in the outcome of the case amount to mere speculation.  As we noted above, "the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred.  The purpose of this requirement, which has been in use for more than 120 years, is to safeguard against speculative and conjectural claims." (*Viner v. Sweet, supra,* 30 Cal.4th at p. 1241.)

Even given the generous rules for interpretation of the evidence in this context, there is simply not enough to establish O'Shea would have experienced a better outcome, particularly in the absence of expert testimony on causation.  While a forensic expert would have explained, in more detail, certain business related and financial matters, it is mere speculation to conclude that such testimony was the deciding factor in how the custody case turned out for O'Shea.  Accordingly, we find no error in granting Lindenberg's motion for directed verdict.

## III

## DISPOSITION

The judgment is affirmed.  Lindenberg is entitled to her costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

Filed 05/14/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL O'SHEA,<br><br>  Plaintiff and Appellant,<br><br>    v.<br><br>SUSAN F. LINDENBERG et al.,<br><br>  Defendants and Respondents. | G058997<br><br>(Super. Ct. No. 30-2018-00977055)<br><br>ORDER GRANTING REQUEST FOR PUBLICATION; MODIFICATION OF OPINION; NO CHANGE IN JUDGMENT |

The Association of Southern California Defense Counsel has requested that our opinion, filed on April 23, 2021, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. This opinion is ordered published in the Official Reports as modified by the following order.

It is ordered that our opinion filed on April 23, 2021, be modified as follows:

1. On page 4, third full paragraph, the quotation in the first sentence should begin "In" rather than "ln."

2.  On page 5, third line from the top of the page, replace the word "be" with "he" so that the sentence reads:

In his September 2014 Income and Expense Declaration, [O'Shea] acknowledges that within the prior 12 months he had averaged $9,583 in income from those businesses.

3.  On page 7, in the first sentence of the second paragraph, delete the word "family."

There is no change in the judgment.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

2