Filed 8/22/25  P. v. Harmon CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100390 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE017028) |
| v. | |
| JAMIL HARMON, | |
| Defendant and Appellant. | |

A jury found defendant Jamil Harmon guilty of abusing seven-week-old Baby K., found true an allegation that he willfully caused or permitted the baby's health to be endangered, and an allegation that Baby K. was particularly vulnerable.  The trial court granted defendant probation.

On appeal, defendant argues substantial evidence does not support his conviction. He further argues the trial court erred in admitting evidence that he used marijuana, and to the extent his attorney failed to object to this evidence under Evidence Code sections 352 and 1101, his counsel was ineffective.

1

We hold that substantial evidence supports defendant's conviction, the trial court did not err in admitting evidence of defendant's use of marijuana, and that defendant did not suffer the ineffective assistance of counsel.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The information alleged defendant committed felony child abuse against the victim, Baby K. (Pen. Code, §273a, subd. (a); statutory code citations that follow are to the Penal Code.) The information also alleged defendant inflicted great bodily injury on the victim (§ 12022.7, subds. (a) & (d)) and alleged four aggravating factors: (1) the crime involved great violence; great bodily harm, the threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness, or callousness; (2) the victim was particularly vulnerable; (3) the defendant took advantage of a position of trust or confidence to commit the offense; and (4) defendant engaged in violent conduct that indicates a serious danger to society. (Cal. Rules of Court, rule 4.421, subds. (a)(1), (a)(3), (a)(11), & (b)(1).)

### Baby K.'s Birth and Events Leading to his Hospitalization

When she was pregnant, mother went to parenting classes to learn how to be a good parent. Defendant would sometimes attend these classes with her although he often refused to go.

Mother and defendant exchanged text messages about the parenting classes. In the first exchange reviewed at trial, defendant responded with, "Girl, no, you not finna be doing all these classes and going to school and working. You're tryna to do way too . . . fucking much." In another text message exchange, mother texted defendant about classes about potty training and positive discipline. Defendant responded, "Girl, that's shit we don't even need to be learning. I know how to potty train, and I know how I'm going to discipline my fucking kid." Defendant told mother the reason he didn't want to go to the

2

classes was because he did not need them. Another time, he texted, "Those classes are a waste of time. All the shit that they have to offer, we have already." A third time, he texted, "I don't care. I don't need shit from that stupid-ass class. She's not teaching me shit." On other days, he just texted he was not going to go to the classes and mother testified he refused to come to the classes "a lot."

Mother delivered Baby K. by means of an uneventful C-section in late March 2020. Baby K. had no notable injuries.

A doctor examined Baby K. four days after his birth and all appeared normal. The same doctor examined Baby K. on April 14 and again all was well.

Mother, defendant, and the baby lived together. Mother and defendant did not go many places with Baby K. Mother testified during this time no one else watched Baby K. She breastfed Baby K. and never noticed him choking, gagging, or gargling on his milk.

Stepmother, A.W., visited defendant and mother at the end of April and noticed Baby K. was tracking well, active and alert.

Mother testified she left the baby alone with defendant three times before the events that gave rise to Baby K.'s ultimate hospitalization. This occurred in mid-April and early May and mother's absence lasted for, typically, about two hours.

Mother testified she did not hurt Baby K. and did not witness defendant or anyone else hurting him. She denied ever hearing Baby K. cry out in pain when she or defendant picked him up.

Mother testified defendant would sometimes hold Baby K. in the air. She saw defendant regularly throw the baby in the air a few inches above his head. The first time he did this was when the baby was three weeks old. Mother described this as a gentle tossing but would tell him to stop. Defendant would respond, "[H]e's my son. Or he would say, He's a boy. Like, he's fine." Mother testified the last time she saw him do this was two or three weeks prior to the parents bringing Baby K. to the hospital. Defendant would also place Baby K. on his shoulders without supporting the baby's

3

head.  Baby K. would just lay his head flat on defendant's head because he could not yet hold his head up.

On Mothers' Day, May 10, mother and defendant visited stepmother A.W. with Baby K.  This time, A.W. saw that Baby K. was not tracking as much on that day as before, was not very alert, and was acting "kind of like a bump on a log."  A.W. asked mother if she had taken the baby to the doctor and mother said no.  A.W. also noticed when Baby K.'s parents were changing his diaper, the baby cried out and described the cry as "almost like a cry like he was in pain."  Mother testified she did not observe this.

A.W. never saw defendant engage in any inappropriate, violent, or frustrated behavior directed towards Baby K.  Her observations of the parents' interaction with Baby K. were normal.

Mother first noticed Baby K. had a small dot in his eye about a week before she brought him to the hospital.  She thought nothing of it.

The final time mother left defendant alone with Baby K. was on May 18.  About an hour after she left, defendant called her.  Defendant told mother that Baby K. choked on his milk and defendant tried to use a "bulb sucker" to get the milk out.  Defendant told mother he called his mother and then an ambulance.  Mother immediately left for home.

When mother arrived at her home, Baby K. was crying and did not sound normal.  The EMT recommended that the parents take Baby K. to a nearby hospital which they did.  At the hospital, mother learned Baby K. had serious injuries.

Hospitalization

Upon his admission to the hospital, Baby K. was in a state of hypothermia because his parents dressed him in a onesie with the car windows rolled down when they brought him in.

At the hospital, Dr. Jihuy Yuk, an expert on pediatric child abuse, examined Baby K.

4

In terms of suspected child abuse, one of the baby's initial examiners pointed out to Dr. Yuk a subconjunctival hemorrhage (which is a burst blood vessel in the eye) which was "highly concerning for inflicted trauma." This hemorrhage appeared as a red mark in the eye. It takes an "incredibly high amount of increased thoracic pressure to build up in [the] chest" to burst the blood vessel. It could be caused by a choking or squeezing force. Young infants do not have the muscle strength in their chest to cause that injury to themselves. Dr. Yuk did not believe the reported choking incident caused this injury, nor would merely applying a strong grip on the child when holding him have caused this injury Dr. Yuk concluded this injury was consistent with inflicted trauma.

Dr. Yuk testified while Baby K. was at the hospital, the baby appeared small and did not move much, and he was generally sleepy. His weight was lower than was to be expected. The baby had difficulty swallowing. He also had an abnormal liver function. This can be a sign of blunt force trauma to the liver or an infection. There was no indication the baby had an infection, so the doctor was concerned the baby had sustained blunt force trauma to the liver.

Yuk also found the baby had hypoxic ischemic injury in his brain. This means Baby K. suffered brain injuries due to the lack of oxygen. Baby K. also had a low heart rate which can be another indication of brain issues. These injuries likely occurred between when the baby was two weeks old but probably closer to four weeks. These types of injuries are typically caused by a traffic accident, a stroke, a cardiac condition, or being strangled or squeezed to the point where the person is unable to breathe. There was no evidence Baby K. had a stroke, cardiac condition, or was in a car accident. Dr. Yuk testified this injury was not consistent with defendant's story that Baby K. choked on milk. Dr. Yuk considered these injuries to be more consistent with inflicted trauma.

The baby was not really tracking visual and auditory stimuli. Typically, this meant the baby had a brain function problem or they were born with a genetic condition. The hospital ruled out a genetic condition as the cause of Baby K.'s condition.

5

Dr. Yuk further discovered Baby K. had seven healing rib fractures which were also indicative of suspected child abuse. These injuries were between 10 days and three weeks old. Dr. Yuk stated that a posterior fracture typically occurs with a squeezing force, typically by the fingers in the child's back while holding the baby face to face. These rib fractures likely occurred at the same time as the hypoxic ischemic injury and were the product of inflicted trauma. Dr. Yuk explained symptoms of rib fractures included high pitched crying, trouble sleeping or feeding, and possibly trouble breathing. The doctor concluded the injuries were not caused by a co-sleeping incident.

Finally, as to Baby K.'s physical condition, he had soft tissue damage to his neck and throat. That damage could have been consistent with defendant using the aspirator during the choking incident. Dr. Yuk was concerned that this was a nonaccidental injury.

Dr. Yuk spoke with defendant. Defendant's explanation to the doctor about the milk choking incident was not consistent with the rib fractures, the brain injury, or the burst blood vessel. Dr. Yuk also testified that was the only history presented to her about the child's condition. Dr. Yuk testified that these injuries could not be caused by burping an infant too hard, or from him falling from a "medium to low level height." The doctor also said, "throwing an infant into the air and [then] catching him, maybe, even gripping him a little tightly" did not constitute reasonable explanations for the injuries.

Dr. Yuk concluded the "subconjunctival hemorrhage, the rib fractures, as well as the hypoxic injury to the brain were extremely concerning for child abuse to me."

The Investigation

Sacramento County Sheriff's Detective Lindsey Lamb took statements from defendant three times. Each of these interviews was recorded and the recording was played for the jury.

The first time Detective Lamb spoke to defendant, he reported that he was feeding Baby K. a bottle of milk and the baby started to choke. Defendant told the detective he

6

took a nasal aspirator or bulb to suck the milk out of Baby K.'s throat. Defendant became concerned about the baby's welfare so he called his own mother and she advised him to call 9-1-1 -- which he did. The fire department arrived, determined there was no emergency requiring that they transport Baby K. to the hospital, and they advised defendant to take the baby to the doctor for a follow up.

Defendant told the detective there had been no choking incidents as bad as this one and the only persons who took care of the baby were him and mother. Defendant speculated he could have burped the baby too hard and that may have caused some of the baby's injuries.

During the second interview which shortly followed the first, defendant said he believed some of Baby K.'s injuries could have been caused when the baby almost fell out of his lap about a week prior to the hospital visit. Defendant claimed he was burping Baby K., when the baby started to roll off his lap which defendant prevented by grabbing the baby around his waist and feet. He also shared a second episode where he was carrying Baby K., who threw his head back and almost fell out of his arms, but defendant caught the baby before falling.

In the third interview, 30 minutes after the second one, defendant approached Detective Lamb while she was in her car. Defendant shared a fourth explanation for the injuries. Defendant claimed he would play with Baby K. by tossing him up in the air (like Simba from the Lion King) and catching him around the waist and that might have caused the injuries. He stopped this game when Baby K. would whine or cry. Defendant admitted to the detective, "I don't want to blame myself but it could have been me."

Detective Lamb relayed defendant's statements about tossing the baby in the air to Dr. Yuk and she opined these actions could not have caused Baby K.'s injuries. Dr. Yuk also told the detective that if the injuries were caused by a crushing or rolling over on the baby, Dr. Yuk would have expected to see more fractures.

7

Detective Lamb examined the contents of defendant's cellular phones. In a message he sent a few weeks before the baby was admitted to the hospital, defendant texted, "It's hard [to be a new parent]. You don't get to sleep or none of that." He continued on, "It's so motherfucking hard. You're, like, you're going to end up bumping heads and fighting because it's so much stress. But you all got to work together because it takes so much to raise a baby." In following messages, defendant stated he was irritated when Baby K. wakes up and it is hard for them to eat. Following that, defendant authored a text saying, "That shit is so irritating. Like then you act like you don't hear him, he gets louder." Defendant continued, "I bet you can. I said that same shit. Then he came on his due date and been an asshole every day -- ever[] since."

In a message extracted the day after the baby was admitted to the hospital, defendant texted a friend "So. He cool. He just has a liver infection and a fractured vertebrae." He also claimed the injuries occurred due to someone holding the baby incorrectly and letting him lean the wrong way.

Mother and defendant broke up in 2022 and do not talk. Mother testified Baby K. now lives with her and has had no medical issues or problems or subsequent hospitalizations since May of 2020.

Defendant's Case

Defendant presented the testimony of Dr. Field, a physician and forensic medicine expert witness. Dr. Field suggested Baby K.'s rib fractures could have been related to a metabolic bone disease like rickets. But Dr. Field saw nothing in Baby K.'s skeletal surveys consistent with metabolic bone disease or rickets. Dr. Field would have expected that the significant amount of external trauma required to cause the fractures would lead to external signs of injury. Dr. Field admitted that posterior rib fractures were highly indicative of child abuse.

8

Dr. Field also asserted the subconjunctival hemorrhage could be caused by a direct injury to the eye: like a flick of a brush or comb, a fingernail or even a family pet. He opined it could also be caused by a major increase in the pressure of the body like a cough or a sneeze, even by choking or gagging. Dr. Field conceded the hemorrhage could be a sign of child abuse. He was unable to explain Baby K.'s elevated liver enzymes because there were no external signs of trauma.

As it related to the hypoxia, Dr. Field agreed that this condition was not caused by a single incident but was a developing condition over time. In Dr. Field's view, there was nothing about the brain injury that revealed its cause. It could have been caused by strangulation, or it was conceivable it was caused by a co-sleeping incident.

Dr. Field testified if he was "trying to explain all [of] the findings, I would say that something [had] happened two or three weeks ago, prior to the emergency department visit." He also concluded Baby K.'s condition could not be explained by a single hypothetical abuse incident. Some of the things uncovered by the medical team suggested cascading consequences from malnutrition. Dr. Field agreed the rib fractures, eye hemorrhage, and brain hypoxia were also consistent with nonaccidental inflicted abuse or trauma.

Defendant testified that two months before the baby's birth, he and mother moved in together. At that residence, staff performed drug tests on the residents weekly. Mother, defendant, and Baby K. lived in this housing until Baby K. was taken by CPS due to the hospitalization at issue here.

Before the baby was born, defendant did not believe he needed parenting classes because they did not apply to him as a new parent. Defendant also testified they already had a car seat which explained why he was not interested in one of the classes. He claimed he completed two classes before Baby K. was born.

9

Defendant confirmed that either mother or defendant had watched the baby since he was born and they never left him in someone else's care. Defendant testified he was not left alone with Baby K. often because defendant ran most of the errands.

Defendant testified he and mother took Baby K. to a party in early May. At that party, defendant's nephew, G., was jumping around and fell on Baby K. Defendant thought nothing of this because Baby K. did not react, and G. did not fall on the baby with his full weight.

Defendant also remembered going to stepmother A.W.'s house on Mother's Day, May 10. Nothing that happened during that visit stuck out in his mind or caused him concern. Defendant did not recall the baby crying out in any particular way when they were changing Baby K. Defendant testified Baby K. never showed any bruises or signs of pain.

Defendant asserted he never acted out with Baby K.

Defendant testified he would play with Baby K. by laying him down and kissing his stomach. Other times, he would raise him up to see his expression change and bring him back down. He did this while sitting or lying down. Defendant denied throwing his "baby in the air high enough to where it would hurt him" although he agreed he should not have tossed him. He also put the baby on his shoulders without supporting his head, but he stopped doing it when his mother told him to stop. Defendant never heard Baby K. cry out painfully as a result of any play. Defendant testified he never squeezed the baby or did so hard enough for the baby to lose consciousness. He did not believe mother did either. Defendant told the jury he did not break Baby K.'s ribs.

The defendant told the jury that the day the baby choked on milk mother went to an appointment, so defendant warmed up the baby's bottle. As defendant was feeding Baby K. a bottle, the baby began to choke and this caused defendant to panic. His first instinct was to use the "bulb sucker" to suck the fluid out of the baby's esophagus. When he noticed blood, he called his mother and she told him to call 9-1-1 which he did.

10

Defendant confirmed the EMTs told him his baby was okay. They recommended defendant and mother take Baby K. to the hospital for a checkup. Defendant believed this set of circumstances was fortunate because they never would have known about Baby K.'s injuries if they had not brought him to the hospital.

The EMTs did not mention anything about the baby's eye and defendant did not notice any eye injury. The first time he learned about this was when he was told about the rib fractures, the baby being unresponsive, and that the baby had bleeding on his brain. Defendant was in shock when he heard this news. His first thought was that the injuries had something to do with a spinal tap performed at the hospital.

Defendant told the jury about one time Baby K. was sitting on his lap while defendant was on the couch. He explained the baby did a "crazy body movement, and I caught him between my legs and my hands."

Defendant also explained that when he spoke to Detective Lamb, he did so because his sister told him to tell the detective "whatever possibility that could have happened" that he thought might have caused the injuries to the baby. Defendant believed the detective was insinuating he hurt Baby K. and he was trying to give possibilities so she would not think he was the bad guy. Defendant admitted he gave Detective Lamb several different explanations for Baby K.'s injuries: burping, almost falling a couple times and him catching the baby; and throwing him in the air above his head a couple inches from his hands. Defendant did not tell the Detective that a cousin had fallen on the baby.

Two days after Baby K. was admitted to the hospital, defendant responded to a text message from a friend that said, "we [have] to find [someone] who hurt that baby," with the statement, "Nobody hurt him. It's human error." Defendant claimed to be speculating when he texted the baby's injuries were caused by holding him wrong and letting him lean the wrong way. Defendant also testified he used the language calling his son an "asshole," meaning his son was a lot like him and a lot to deal with.

11

<u>Marijuana</u> <u>Use</u>

Several times during the case, the evidence of defendant's use of marijuana arose. The prosecutor asked mother if defendant smoked anything other than cigarettes. Over defense counsel's relevance objection, mother said defendant often smoked "weed," and did so as often as a couple times a day. In response to this question, defense counsel asked mother if she thought his smoking of marijuana affected his demeanor to Baby K. Mother responded, "[n]ot at all."

Later, the prosecutor asked defendant's mother if he had ever told her he smoked marijuana when he was taking care of Baby K. Without an objection, defendant's mother said, "No." The Court sustained an "opinion" objection as to whether defendant's mother thought it was appropriate for defendant to smoke marijuana when he was taking care of a newborn. Defendant's mother told the jury she never smoked marijuana when she raised her children. After her answer, defense counsel objected based on relevance and the trial court overruled the objection.

The prosecutor asked defendant's mother, "If you did learn, in fact, that your son, when [Baby K.] was four to five weeks old, would throw him in the air and catch up him multiple times, would sit him on his shoulders like we talked about, and would smoke marijuana while raising [Baby K.], would that change your opinion as to whether or not he was a loving father?" Over defendant's objection that this question was based on "facts not in evidence," defendant's mother answered, "Whether he's a loving father? I would -- would still know in my heart that my son is loving to his son. However, that would not be appropriate, nor would that be something that I would condone."

On direct examination, defendant testified that the drug testing at his residence included testing for marijuana and he would be kicked out of the housing if he tested positive. Defendant asserted he stopped smoking marijuana before the baby was born

12

due to this restriction. Defendant told the jury he tested negative for drugs on a weekly basis pursuant to the terms of his lease.

The prosecutor asked defendant if he would smoke marijuana when he was overwhelmed by Baby K. Defendant repeated he stopped smoking marijuana prior to Baby K.'s birth.

During closing argument, the prosecutor returned to the theme of marijuana use when he gave an example of circumstantial evidence. The prosecutor asked the jury to imagine a grocery store where two people were assigned to stock flour without supervision and one day the manager finds flour all over the floor. The prosecutor postulated the female employee signed up for all the trainings and went to them, but the male employee stopped going to the trainings because he knew everything he needed to know. The prosecutor called that distinction a red flag. The prosecutor then hypothesized that the male employee improperly handled the flour, put it on his shoulders and threw it up in the air, while the female employee did not. This was another "red flag" according to the prosecutor. Next, the prosecutor told the jury the female employee explains the breakage by saying she did bump a shelf, but never heard or saw anything. The male employee gives multiple statements: he patted the flour bag too hard; but then came back and says there was a time the flour bag almost fell out of my hands; and then a third time and says a few times I threw the bag in the air. The prosecutor called the male's repeated excuses as suspicious especially when the flour company rejected each one.

Finally, the prosecutor closed out his example with this: "The manager never saw the male employee break or rip open that flour bag. But the only evidence he has points to that male employee. That male employee who disregarded, became irritated with training, even before the flour bag job started. This male employee who was the only one who was rough with the flour bag. This male employee who tried to give multiple explanations, time and time again. This male employee who smoked on his -- marijuana

13

on his breaks, maybe even before the job started.  And marijuana is not a crime.  We don't condemn people for smoking it.  But, certainly, when you're talking about carefully handling something like a flour bag, that's something that can be considered as well.  [¶] All the signs and the evidence point to just one person.  There's only one reasonable explanation.  That's the male employee."

The prosecutor also mentioned defendant's marijuana use when he characterized defendant as someone who did not prioritize what is best for his baby.  "This is someone who doesn't have a job, who's sitting around the house smoking marijuana, maybe filling out some applications here and there, doing some studying.  But on other days, he even admitted he would just chill at the house and do nothing."

<u>Verdict</u> <u>and</u> <u>sentencing</u>

The jury found defendant guilty of child abuse.  (§ 273a, subd. (a).)  The jury also found true the allegation defendant willfully caused or permitted the victim's health or person to be endangered and the victim was particularly vulnerable.  As to the remaining allegations, the jury found not true that defendant willfully inflicted unjustified pain or suffering on the victim, that defendant personally inflicted great bodily injury upon the victim, that defendant took advantage of a position of trust to commit the offenses, and that defendant engaged in violent conduct which indicates he is a serious danger to society.

The trial court granted defendant probation on the condition he serve 180 days in county jail.

Defendant filed a timely notice of appeal.

14

I

*Sufficiency of the Evidence*

Defendant argues there was insufficient evidence defendant caused or permitted Baby K.'s health or person to be endangered.

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the verdict, drawing all inferences that reasonably support it, and determine whether it contains substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- from which a trier of fact could rationally find the defendant guilty beyond a reasonable doubt.  [Citations.]  In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses.  [Citation.]  Moreover, because it is the jury, not the reviewing court, that must be convinced of the defendant's guilt beyond a reasonable doubt, we are bound to sustain a conviction that is supported by only circumstantial evidence, even if that evidence is also reasonably susceptible of an interpretation that suggests innocence."  (*People v. Little* (2004) 115 Cal.App.4th 766, 771.)

Section 273a, subdivision (a), states, "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

" 'Violation of section 273a, subdivision (a) " 'can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child

15

abuse by direct assault and child endangering by extreme neglect.' " ' " (*People v. Cockburn* (2003) 109 Cal.App.4th 1151, 1160.)  Here, the prosecutor chose to pursue both -- that defendant was the person who abused Baby K. and alternatively, that he had custody of Baby K. and willfully permitted the health of the child to be endangered.

The elements of direct child abuse required the jury to find defendant to have engaged in willful conduct "and it must be committed under circumstances 'likely to produce great bodily harm or death.'  . . . 'Great bodily harm refers to significant or substantial injury and does not refer to trivial or insignificant injury.'  However, there is no requirement that the victim suffer great bodily harm." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 80.)

Alternatively, the elements of indirect child abuse required the jury to find defendant had care or custody of Baby K. and permitted the baby's health to be endangered.  (*People v. Peabody* (1975) 46 Cal.App.3d 43, 46.)  Defendant must have engaged in "criminal negligence which means that the defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life." (*Id*. at pp. 48-49.)

Starting with direct abuse, Dr. Yuk testified that Baby K.'s injuries were consistent with inflicted trauma.  The seven broken ribs required a powerful squeezing force and the baby's abnormal liver function was likely caused by blunt force trauma. Further, the baby's brain injuries demonstrated repeated injuries to the baby, not a single episode of abuse.  Given the nature and severity of Baby K.'s injuries, the only question in this case was whether defendant was the person who abused Baby K.

We conclude the circumstantial evidence was sufficient to support the jury's determination beyond a reasonable doubt defendant abused Baby K.  The only two people who watched Baby K. in his first seven weeks of life were defendant and the

16

baby's mother. According to mother, defendant was left alone with the baby in mid-April, early May, and the day the baby was hospitalized. The only direct evidence of any person injuring Baby K. was his admission that he placed the nasal aspirator into the baby's mouth in his attempt to clear the child's esophagus while the baby was choking.

The hypoxic brain injury and the rib fractures occurred 10 days to three weeks prior to the time the baby was brought into the hospital. This corresponds to the times defendant had the baby on his own in early May and mid-April. Defendant's solo care taking sessions occurred after the April 14 doctor's visit where the baby had no indications of abuse and when the stepmother saw the child was tracking, active and alert. Also of note is that the time frame the injuries were inflicted was before the Mother's Day visit where mother's stepmother testified the baby did not track well and cried out in pain when he was changed.

As between mother and defendant (the only two people to care for the baby in his short seven-week life), the evidence demonstrated mother was diligent in attending classes to learn how to properly care for her new infant. Defendant repeatedly refused to go based on his view that he knew everything there was to know about raising a baby. His text messages showed his disdain for the classes and the concept of learning how to care for his soon-to-born baby.

Defendant was observed handling the baby in a rough and inappropriate manner during this time. Defendant placed the child on his shoulders without supporting the baby's neck and threw him up in the air. When told not to, he replied, "he's my son. Or he would say, He's a boy. Like he's fine." While these were not the cause of the baby's injuries, they are evidence of his lack of due care for the health of his child. Similarly, defendant's text message referring to his baby as an "asshole" and his use of marijuana, as testified to by mother, provide further evidence he did not use due care when caretaking his son.

17

Both mother and father testified mother did not cause the injuries.  While they were equally positive in the contention that father did not cause the injuries, the jury heard and saw both witnesses and was entitled to decide which of the two was not being truthful.  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  It is also important to remember defendant's admission to Detective Lamb, "I don't want to blame myself but it could have been me."

When the injuries were discovered at the hospital, defendant came up with multiple different stories about how Baby K. could have been injured.  The first one was in a text message where he said someone held the baby incorrectly.  Next, he told Detective Lamb he burped the baby improperly.  After that came the story defendant caught Baby K. when he almost fell off his lap.  The last story defendant told the detective was that Baby K. was injured when he held him up like Simba and tossed him into the air and then caught him.  Finally, at trial, defendant came up with a new story of a nephew falling onto Baby K. at a birthday party.  The stories defendant told the detective were not consistent with the baby's injuries.  The jury could view the sheer number and shifting nature of the stories as evidence of defendant's prevarication as to how Baby K. was injured, and that defendant was the one who did it.  (See, *People v. Day* (1945) 71 Cal.App.2d 1, 4 [When there are conflicts, it "is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)

Finally, the evidence before the jury was that the baby was now in the care and custody of the mother and there had been no repeat injuries to or hospitalization of the baby in the intervening three years.

18

Taken together, this evidence constitutes substantial evidence that defendant is the person who injured Baby K. and willfully inflicted injuries on Baby K. under circumstances likely to produce great bodily harm or death.

This analysis is not undercut by the jury's not-true finding that defendant did not inflict great bodily injury on the victim or willfully inflicted unjustified pain or suffering on the victim. "[I]nconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence. [Citation.] '[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' [Citation.] The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense [citation]." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405.)

For this same reason, we have no occasion to determine whether substantial evidence exists if defendant is guilty on the alternative endangerment theory. (Cf. *People v. Miranda*, *supra*, 192 Cal.App.4th at pp. 405–406.) Indeed, defendant fails to cite a case, nor has our independent research found one, suggesting this rule should not apply when alternative theories are alleged and properly submitted without an unanimity instruction. (See *People v. Vargas* (1988) 204 Cal.App.3d 1455, 1461-1462 [holding unanimity instructions are not required when injuries are caused by a continuous course of conduct.)

We further reject defendant's assertion the evidence in this case demonstrates nothing more than defendant's ignorance of proper parenting. Contrary to defendant's argument, the injuries inflicted on Baby K. are in no way comparable to overmedicating a child with aspirin and not providing the child with nutritional food. (See, *In re Maria R.* (1976) 64 Cal.App.3d 731, 733.) Baby K. had broken ribs, ischemic brain injuries, a subconjunctival bruise in his eye, and elevated liver function and the actions that caused

19

these injuries were consistent with intentionally inflicted trauma and nonaccidental trauma.

## II

### *Marijuana Use*

Defendant also argues the trial court erred in allowing the prosecution to question defendant and others about his marijuana use because this evidence was not relevant to any disputed fact of consequence. He further argues his attorney was ineffective because he failed to object to this evidence under Evidence Code sections 352 or 1101. Defendant has failed to demonstrate this evidence was irrelevant or his counsel was prejudicially ineffective.

Defendant objected to the admission of evidence related to marijuana use on relevance grounds four times. The trial court sustained the relevance objection once as to the question when defendant started to use marijuana. The trial court overruled the relevance objection three times: first, as to whether he smoked more than just cigarettes, second, as to defendant's use of marijuana multiple times, and third, as to whether defendant's mother ever smoked marijuana. Other times, the evidence came in without objection, over objections on different grounds, and even from defendant's own direct testimony. To the extent testimony came into the record without a relevance objection, defendant forfeited his ability to challenge the admission of that evidence due to his failure to raise a relevance objection. (*People v. Pineda* (2022) 13 Cal.5th 186, 234.) Further, the trial court's overruling of the objection three times is an insufficient basis to establish it was futile for counsel to raise the objection to the remaining instances where the evidence was introduced. (*People v. Perez* (2020) 9 Cal.5th 1, 7-8.)

To the extent we examine the times where defendant objected to this evidence on relevance grounds, we conclude the evidence was relevant. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant,

having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The evidence of defendant's drug use was admissible to demonstrate defendant's lack of responsibility while he was caring for Baby K., similar to his actions when he would throw the baby up in the air and catch him or balance Baby K. on his neck without supporting his head.

For example, in *People v. Kinkead* (2000) 80 Cal.App.4th 1113, 1121, the appellate court concluded the prosecutor's argument that among other things the defendant smoked marijuana was relevant to determining whether he was criminally negligent in caring for an infant. Similarly, in *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1168, the evidence of the defendant's drug use was relevant to whether he willfully permitted a child in his custody to be placed in a situation where his health was endangered. Simply put, evidence of the use of an intoxicating substance while caring for children is relevant to the question of how defendant took care of Baby K. This lack of due care was but one piece of the evidence that the jury could consider when trying to ascertain whether he or mother was the person who abused Baby K. We decline to require expert witness testimony that it is not appropriate for a caregiver for a newborn to do so while under the influence of an intoxicating drug. Defendant's citation to *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, on this point and its holding that the intoxicating effect of marijuana requires expert testimony, has no relevance here.

Further, this is not a case, as defendant suggests, where this evidence was admitted to demonstrate defendant broke other laws irrelevant to his crime. (*People v. Davis* (1965) 233 Cal.App.2d 156, 161.) It is a case where this evidence was directly relevant to the specific crime charged of child abuse.

As defendant concedes, his counsel did not object to this evidence under Evidence Code sections 352 or 1101. To the extent that he raises these arguments here, his

21

counsel's failure to object forfeited those claims. (*People v. Pineda*, *supra*,13 Cal.5th at p. 234.)

To the extent defendant attempts to resurrect this claim via the vehicle of ineffective assistance of counsel, that attempt also fails. To establish a claim of ineffective assistance of counsel, defendant must prove that (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in prejudice to defendant. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) If either element is missing, the defendant's claim of ineffective assistance fails. (*Strickland*, at p. 697.) The lack of prejudice alone defeats defendant's contention of ineffective assistance. (*Ibid*. ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"].)

To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.) "In demonstrating prejudice, the appellant 'must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.)

Even assuming evidence of whether defendant used marijuana should not have been admitted, it only appears in nine pages of the 999 pages of transcript. Mother stated defendant smoked weed "often" which to her meant a "couple times a day." Defendant stated he stopped using marijuana before Baby K. was born. Defendant's mother said defendant never informed her he smoked marijuana. In the prosecutor's closing argument, marijuana was mentioned as a single factor by the prosecutor as to whether the jury could find defendant guilty of child abuse in this circumstantial case. The prosecutor

also argued defendant's marijuana use demonstrated he was someone who was not prioritizing his baby's health.

On this record, defendant fails to convince us that but for the admission of this evidence, there was a reasonable probability the result would have been different. This is especially true in light of the other evidence we have already discussed, *supra*, that supported the jury's determination defendant was guilty of child abuse.

## DISPOSITION

The judgment is affirmed.

                                            _____

                                            HULL, Acting P. J.

We concur:

_____

KRAUSE, J.

_____

BOULWARE EURIE, J.