Filed 12/17/25  P.A. v. Plaza Towing CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| P.A., a Minor, etc., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>PLAZA TOWING, INC., et al.,<br><br>Defendants and Respondents. | G063912<br><br>(Super. Ct. No. PSC1904162)<br><br>ORDER DENYING REHEARING AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |

Appellants' petition for rehearing is DENIED.

The opinion filed in this case on November 20, 2025, is modified in the following respects:

1. On page 23, delete the first full paragraph in its entirety, beginning with the words "We conclude" (which includes footnote 13), and replace it with the following paragraphs (which include a new footnote 13):

We conclude the admission of the methamphetamine evidence caused no miscarriage of justice. In reaching this conclusion, we have

considered whether the evidence supporting the existing judgment is so strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error we found affected the jury's result. (See *People v. Breverman* (1998) 19 Cal.4th 142, 177–178.)[1]

The evidence regarding the methamphetamine in Andrade's system was extremely weak. Defendants' own expert, Dr. Tanen, admitted the only thing he could conclude from the methamphetamine test result was simply that some methamphetamine was present in Andrade's system. He conceded he could not offer any opinion about what effects, if any, that level of methamphetamine would likely have had on Andrade's behavior that night, including whether it caused him to be impaired in any way. Thus, it is unlikely the methamphetamine evidence affected the jury's verdict, as it told the jury literally nothing about whether the methamphetamine had any effect on Andrade's behavior that night so as to cause or contribute to the accident. We are not persuaded by plaintiffs' suggestion that simply hearing of the presence of methamphetamine in Andrade's system would so inflame and prejudice the jurors against him as to render them incapable of fairly and rationally evaluating the evidence.

In contrast, the evidence regarding the alcohol levels in Andrade's system, and his resulting impairment, was strong. The evidence properly before the jury showed Andrade was over the 0.08

---

[1] *Breverman* elaborates on the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). The *Watson* standard applies in both civil and criminal cases. (See *Cassim v. Allstate Ins. Co.,* *supra,* 33 Cal.4th at p. 801.)

blood alcohol level at which the law presumes impairment for purposes of driving a vehicle. (See Veh. Code, § 23152, subd. (b).) One test result showed Andrade had a blood alcohol level of 0.09 and the other a level of close to 0.10. Dr. Tanen testified that even the lower blood alcohol level would be expected to cause impairment, including poor decision making, trouble walking, and difficulty with balance and coordination. Plaintiffs' expert, Okorocha, conceded that someone with a 0.09 alcohol level could exhibit impairment in (among other things) balance, judgment, and self-control.

The other evidence supporting the jury's verdict also was strong. Rodriguez told the responding officer on the scene that Andrade had moved to the left, in front of his truck, as he tried to drive past. This was corroborated by the undisputed testimony by Brault, defendants' biomechanics expert, that the truck struck Andrade on the left side of his body, which indicated Andrade had turned in front of the truck, as Rodriguez had contemporaneously described. It also was corroborated by the opinion of defense accident reconstructionist Arst that Andrade was more than three feet inside the traffic lane when he was hit. It is clear the jury credited Arst's testimony on this point because, had it credited the opinion by plaintiffs' accident reconstructionist that Andrade was outside the fog line when he was hit, it necessarily would have found Rodriguez negligently veered outside his lane to strike Andrade on the shoulder of the road.

Based on the totality of the evidence—including the strength of the evidence Andrade was impaired by alcohol in ways that established a causal link between the impairment and the accident and the corroborating evidence regarding Andrade's conduct that night—we

3

conclude plaintiffs have not shown that, absent the improperly-admitted evidence regarding the methamphetamine test results, there was a reasonable probability the jury would reached a result more favorable to them.

These modifications do not affect a change in the judgment.


GOODING, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


DELANEY, J.

Filed 11/20/25  P.A. v. Plaza Towing CA4/3 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| P.A., a Minor, etc., et al., | |
| Plaintiffs and Appellants, | G063912 |
| v. | (Super. Ct. No. PSC1904162) |
| PLAZA TOWING, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Riverside County, Kira L. Klatchko, Judge. Affirmed.

Sullivan & Sullivan, Gene Sullivan, Ryan A. Medler; B&D Law Group, Michael Geoola, Mahsa Farid; Esner, Chang, Boyer & Murphy, Shea S. Murphy, and Kevin K. Nguyen for Plaintiffs and Appellants.

Law Offices of Scott C. Stratman, Denise Di Mascio; Greines, Martin, Stein & Richland, Edward L. Xanders, and Kent W. Toland for Defendants and Respondents.

In the wee hours of June 21, 2017, Salvador Andrade was walking along a road near Indio when he was hit by a tow truck driving back from a job. Andrade suffered fatal injuries and died at the scene. His estate and his two young children, sued the driver of the tow truck, Aaron Rodriguez, and his employer, Plaza Towing, Inc., for wrongful death.

Toxicology tests performed on blood and fluid samples taken from Andrade's body during an autopsy revealed a blood alcohol level of at least 0.090 and the presence of methamphetamine. Defendants sought to introduce this toxicology evidence at trial by way of two witnesses—the toxicologist who supervised the testing and a physician with expertise in medical toxicology—to show Andrade was impaired as a result of the alcohol and methamphetamine and his impairment caused or substantially contributed to the accident.

Plaintiffs filed a motion in limine to exclude this evidence, contending it was irrelevant, speculative, unreliable, and unduly prejudicial. The trial court denied the motion. At trial, both sides presented expert testimony interpreting the toxicology test results. The jury returned a verdict in favor of defendants. Following entry of judgment, plaintiffs appealed.

We conclude the trial court did not err in admitting evidence regarding Andrade's postmortem alcohol results but erred by admitting the methamphetamine evidence. Any error in admitting the methamphetamine evidence, however, was not prejudicial. We also reject plaintiffs' argument the trial court abused its discretion by denying their for cause challenge to one of the jurors based on her comments during voir dire. We affirm the judgment.

STATEMENT OF FACTS

On the evening of June 20, 2017, Rodriguez, a senior tow truck driver for Plaza Towing, was working an evening shift. The shift started at 4:00 p.m. and was to end at midnight on June 21, 2017. That night, he had been dispatched to assist a disabled car in Brawley, about 60 to 70 miles from Plaza Towing's yard in Indio. After completing the job, Rodriguez stopped for dinner in Brawley and then headed back to the tow yard around 10:40 p.m.

To get there, Rodriguez had to travel on Highway 86 going north, and then exit at Dillon Road, a two-lane road with a shoulder demarcated by a white line the parties referred to as the "fog line". He turned left onto westbound Dillon Road, going underneath the Highway 86 overpass and through an intersection. The road was very dark and Rodriguez was using his low beam headlights. He had driven this path quite a few times in the past.

About 100 feet from the Dillon Road exit was a small bridge over a wash area with guardrails on either side. The bridge was narrower than the road leading onto and off of it, and the road onto the bridge angled slightly to the right.

As Rodriguez approached the bridge, he noticed a man walking westbound along the right side of Dillon Road about 85 feet in front of him. Rodriguez had seen pedestrians walking in this area before. He did not apply his brakes, sound his horn, or flash his headlights at the pedestrian, whose back was to the truck. As Rodriguez traversed the bridge at a speed somewhere between 30 and 45 miles per hour, he saw "something" in the corner of his right eye and turned his steering wheel a little to the left. He then heard a sound resembling a thump or a bang.

3

Rodriguez testified at trial he did not realize what he had hit because he had taken his eye off the pedestrian prior to hearing the thump. He stopped the truck and backed it up a few feet along the side of the road.

Another car stopped and someone got out, asking what had happened. Rodriguez replied he had hit someone. While Rodriguez was calling 911, the other person left the scene. That person was never identified.

Rodriguez saw a bit of metal from his headlight assembly on the ground near the rear wheel of the truck, and nearby he observed the body of the pedestrian, later identified as Andrade, lying on the shoulder of the road. Andrade died at the scene.

Officer Tage Belisle of the California Highway Patrol was among the police officers dispatched to Dillon Road. He arrived at approximately 1:34 a.m. and administered a field sobriety test to Rodriguez. Rodriguez was not determined to be under the influence of any substances. Officer Belisle checked Andrade's residence information and concluded he was unhoused. No drugs, drug paraphernalia, or alcohol were found at the scene.

An autopsy was performed on Andrade's body 10 hours later. It revealed Andrade had suffered significant injuries to his neck. In addition to abrasions and contusions on his neck, there was both a hemorrhage in the musculature and a very fine fracture of the first cervical vertebrae on the right side of his neck. The forensic pathologist who performed the autopsy, Jolie Rodriguez, determined the cause of death was blunt force neck injury.[2] She could not, however, pinpoint whether the blunt force injury occurred at

---

[2] There does not appear to be any relation between Jolie Rodriguez and defendant Rodriguez.

4

the point of impact with the tow truck or at the point of impact with another object or the ground.

Samples of Andrade's femoral blood, urine, and vitreous fluid were taken during the autopsy and sent to an outside laboratory for forensic toxicology testing.[3] The blood sample was screened for multiple drug categories, including amphetamines and cannabinoids. Because that initial screening detected amphetamines, further confirmation testing was performed. The toxicologist, Erin Crabtrey, testified the confirmation testing showed 0.838 milligrams of methamphetamine per liter, and 0.045 milligrams per liter of amphetamine, in the blood.[4]

Crabtrey's lab also performed two types of alcohol testing. The first test analyzed a sample of Andrade's femoral blood using headspace gas chromatography. That test, also known as Headspace GC, allows for identification of ethyl alcohol, which is the type of alcohol in beer, wine, and spirits. The alcohol level was .090 percent, above the .080 legal driving limit in California. The second test was performed on a vitreous humor sample, also using the Headspace GC method. The alcohol level in that sample was 0.098, slightly higher than in the blood.

PROCEDURAL HISTORY

Prior to trial, plaintiffs filed a motion in limine to exclude any reference to Andrade's toxicology results, including Crabtrey's testimony, as well as the opinion of defendants' medical toxicology expert, Dr. David Tanen. Plaintiffs argued, among other things, the toxicology results were

---

[3] Vitreous humor or vitreous fluid is the fluid inside the eyeball.

[4] Crabtrey testified amphetamine is the metabolite or breakdown product of methamphetamine.

unconfirmed and unreliable, and had no probative value. They further argued any potential probative value would be exceeded by the undue prejudice that would be caused by permitting the jury to hear the evidence. Finding the evidence was "highly probative, . . . but . . . not unduly prejudicial on balance," the trial court denied plaintiffs' motion.

Several percipient and expert witnesses testified at trial. Andrade's nephew, Peter Corona, testified he heard from relatives who spent time with Andrade at a casino on the evening of his death. Corona testified that, at the end of the evening, his relatives offered Andrade a ride home, but Andrade said he would walk to his mother's house, where he was staying.

Officer Belisle testified he interviewed Rodriguez at the scene on the night of the accident. Rodriguez told him Andrade was walking "a foot and a half within the westbound lane of Dillon Road from the solid white line," and as Rodriguez came closer, Andrade "moved farther to the left and into the lane in front of his truck."

Plaintiffs played the videotaped deposition of expert Frank Perez, who opined on human factors involved in the accident, such as perception, reaction time, and visibility. Based on the size and throw of the headlights on a typical tow truck, Perez testified a reasonable driver would have been able to see a pedestrian on the street from 150 feet away.

Based on the debris pattern after the crash, plaintiffs' accident reconstruction expert, John Smith, opined Andrade was one foot *to the right* of the fog line when he was struck. Also based on the debris pattern, Defendants' accident reconstructionist, Jason Arst, opined Andrade was struck about three and one-half feet *to the left* of the fog line.

Another defense expert, John Brault, testified about the biomechanics of the accident, opining Andrade was hit by the truck on the

6

left side of his body, not on his back, and not on the front or right side of his body. In his opinion, this indicated Andrade was not facing away from the truck when he was hit, but that he had turned in front of the truck.

*A. Okorie Okorocha – Plaintiffs' Toxicology Expert*

Plaintiffs called Okorie Okorocha, a forensic toxicologist and lawyer, to testify to the testing performed on the fluid samples taken from Andrade's body.[5] He rendered opinions on both the methamphetamine and alcohol testing and what he viewed as flaws in the resulting evidence.

As to methamphetamine test results, Okorocha said there were two problems. First, methamphetamine can come in two forms: (1) Levo or L-methamphetamine, which can be found in over-the-counter cold medicine, or (2) Dextro or D-methamphetamine, which is the prescription-grade or "street" drug. Okorocha said the two types of methamphetamine do not produce the same effects,[6] but the laboratory that tested Andrade's samples did not have the equipment necessary to differentiate between them.

The second problem with the methamphetamine testing, according to Okorocha, was that drugs and chemicals can redistribute in the blood after a person dies. This postmortem redistribution phenomenon can cause organs to release chemicals into the blood, especially where trauma is involved. He opined that stomach contents should be reviewed to see what

---

[5] Okorocha is not a physician but has a bachelor's degree in biology, a master's degree in pharmaceutical science with a specialization in forensic science, and a second master's degree in forensic toxicology.

[6] Okorocha's affidavit in support of plaintiffs' motion in limine stated L-methamphetamine (the type present in some over-the-counter medications) "does NOT have psychoactive effects." But Okorocha did not testify to this difference at trial.

might contaminate a postmortem sample, and that was not done in Andrade's case. He also testified the level of drugs in the system does not necessarily signify impairment because drugs can stay in a person's system for two days longer than their effect might last.

As for the alcohol testing, Okorocha opined it was flawed because it was done postmortem. He said microbes in the body ferment or convert glucose and other substrates in the blood to produce alcohol after a person dies. Under certain conditions, it would not take long for the alcohol level in a body to increase after death; in one experiment, Okorocha testified, a body's postmortem blood alcohol level went from zero to 0.12 in approximately four hours in temperatures of at least 70 degrees. Okorocha also testified that because it had been hot on the day of the accident and Andrade's body had lain on the roadway for some time, he would expect a "significant amount" of postmortem alcohol in the blood. He opined Andrade's antemortem blood alcohol level would have been "at zero or very low"—somewhere below 0.05— to produce the blood alcohol level seen in the testing.

As to the alcohol level measured in Andrade's vitreous fluid, Okorocha testified it was unreliable because no one has been able to extract vitreous fluid from a living subject to compare how the alcohol content in it compares with blood. He said there was only one old research paper supporting using vitreous fluid for alcohol testing, but the tests described in that paper were performed on rabbits, which have significantly different eye physiology than humans. Because there was trauma in Andrade's case, Okorocha opined vitreous samples should have been taken from both eyes rather than just one.

Regarding potential alcohol impairment, Okorocha testified he could not say to a reasonable medical or scientific probability that a 0.09

8

blood alcohol level would have had an impact on Andrade's gait, walk, or mental acuity. This is because, he said, textbooks describe individuals who have much higher blood alcohol levels than Andrade's and yet have no mental or physical impairment. In Okorocha's view, it is only once alcohol levels start getting higher than 0.10 that impairment becomes significantly more likely. On cross-examination, however, Okorocha conceded someone with a 0.09 blood alcohol level could exhibit impairment of balance, speech, vision, reaction time, hearing, judgment, and self-control.

*B. Dr. David Tanen – Defendants' Toxicology Expert*

Dr. Tanen is an emergency physician with a subspecialty in medical toxicology, the study of the interaction between drugs and the human body. Defendants retained him to interpret Andrade's toxicology results and give his opinion on how those results "may translate into behaviors that we see in human beings."[7]

Dr. Tanen opined the 0.09 alcohol level found in Andrade's femoral blood may actually have been lower than it was at the time of the accident because his body would have continued to metabolize alcohol for some time after his death. Each average drink increases the blood alcohol level by .02 percent, and the body generally metabolizes alcohol at the rate of one drink per hour.

Dr. Tanen testified that, although both femoral blood and vitreous fluid from the eye are "reliable sources" for determining the amount of alcohol in the body, the vitreous test is more accurate because the eye is protected from being impacted by other changes that occur in the body

---

[7] Dr. Tanen testified all of his opinions were "to a reasonable degree of medical and scientific probability."

postmortem. In Dr. Tanen's view, the fact that Andrade's blood and vitreous samples registered similar alcohol levels supports the accuracy of the test results.

Dr. Tanen testified someone with a .09 blood alcohol level would "typically" exhibit "poor decision making, trouble walking, trouble with balance, [trouble] in coordination" and "sometimes garbled speech."

With respect to the body's tendency to "ferment" or produce alcohol postmortem as a result of decomposition, Dr. Tanen acknowledged the phenomenon but said such fermentation would not be expected to affect the level of alcohol found in the eye, and in the "vast, vast, vast majority" of instances, such fermentation would produce only a "very tiny amount" of additional alcohol in the blood at the time of an autopsy. He opined such fermentation would be "even nothing or up to like .01." With respect to the "redistribution" phenomenon Okorocha described—in which a drug in one portion of the body can move from tissues into the bloodstream after death—Dr. Tanen testified this does not happen with alcohol.

With respect to the methamphetamine test results, Dr. Tanen stated the initial screening was positive for amphetamine, which required confirmatory testing. The confirmatory test was positive for both amphetamine and methamphetamine. Because methamphetamine is metabolized into amphetamine, one would only expect to see both if methamphetamine was in the system.

Dr. Tanen acknowledged methamphetamine can be present in legal medications, such as certain inhalers and other drugs. But he testified the company that makes the inhaler he referenced had decreased the methamphetamine in the product by more than 60 percent "[a]bout ten years" earlier. He then stated that, in his experience as an emergency room

10

physician, 100 percent of the patients he sees in the emergency room who are found to have methamphetamine in their system had taken the illicit version, D-methamphetamine.

Dr. Tanen was asked by defendants' counsel, "in your experience in working as an emergency room physician, what types of behavior do you see in folks who have methamphetamines in their system?" He responded, "we see agitation, paranoia, hallucinations, violence very commonly." Dr. Tanen did not, however, testify that methamphetamine in the body would be expected to or would typically produce any of those behaviors. Nor did he correlate those behaviors to any particular level of methamphetamine in the body. To the contrary, Dr. Tanen explained "the [testing] number for the methamphetamine is hard to interpret. . . . So the only thing I really take away from the methamphetamine level is whether it's there or not. . . . I won't say anything about like a behavior, but it's different than alcohol." He testified he could not "give any opinions as to what, if any affects [*sic*] [Andrade] might have been having in terms of methamphetamine being in his system." Dr. Tanen acknowledged that, assuming the methamphetamine level found in the toxicology testing was accurate, he could not say "whether or not that number means anything in terms of impairment."

On April 11, 2023, the jury rendered their verdict after about an hour of deliberations, finding defendants had not been negligent.

DISCUSSION

On appeal, plaintiffs argue the trial court abused its discretion in two respects: first, by allowing defendants to present Andrade's toxicology results to the jury as evidence Andrade was impaired at the time of the accident, and second, by denying plaintiffs' request to strike a potential juror for cause based on her voir dire responses.

11

# I.

## PLAINTIFFS' OBJECTION TO THE TOXICOLOGY EVIDENCE

## WAS PRESERVED FOR APPEAL

As an initial matter, defendants assert plaintiffs failed to preserve their objections to the toxicology evidence by not objecting as Crabtrey and Dr. Tanen were testifying. We disagree. Plaintiffs' motion in limine to exclude the toxicology evidence was sufficient to preserve their objections to this testimony.

*People v. Morris* (1991) 53 Cal.3d 152, 189–191 (*Morris*), cited by defendants as support for their argument, is inapposite. In *Morris*, the California Supreme Court stated additional objections might be necessary at trial to preserve an evidentiary issue if a previous motion *in limine* was not sufficiently clear and specific about the evidence sought to be excluded. (*Id.* at pp. 189–190.) But the court ultimately held "a motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*Id.* at p. 190.)

Plaintiffs' motion in limine satisfied these requirements. It sought to exclude the evidence, arguing, among other things, it was

12

unreliable and more prejudicial than probative. No further context was required for the trial court to rule on the admissibility of the evidence.

Defendants also argue the trial court allowed plaintiffs' attorneys to continue to object to toxicology evidence as it came up during trial. Citing *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 451, they argue this indicates the court had not made a final ruling on the motion in limine and further objections at trial therefore were required.

Again, we disagree. When the trial court made its ruling, plaintiffs' lawyer asked for an Evidence Code section 402 hearing to establish a foundation for the evidence.[8] The court replied: "No, *I just denied it* [the motion in limine]. I don't believe 402 is appropriate based on your argument today here. Certainly, there's no reason for that basis, but this doesn't preclude you from making objections depending upon what the testimony actually is, of course. All motions in limine are preliminary in the sense that you shouldn't violate them, *but if there's an appropriate objection that hasn't been addressed, you can always make that at the time that the evidence comes up or if the facts change due to the testimony of other witnesses*." (Italics added.)

The court unequivocally denied plaintiffs' motion to exclude the toxicology evidence. But it left the door open to later objection if other evidence adduced at trial changed the context or affected the admissibility of the toxicology evidence and opinions. Nothing occurred at trial that would

---

[8] All further undesignated statutory references are to the Evidence Code.

have necessitated a renewal of plaintiffs' motion, and further objections would have been futile. The issue was adequately preserved for appeal.[9]

## II.

### STANDARD OF REVIEW

"We review a trial court's evidentiary rulings for abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.) This is particularly so with respect to rulings that turn on the relevance of the proffered evidence. (*Ibid.*) This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' (*Denham v. Superior Court* [(1970)] 2 Cal.3d [557,] 566.) There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.) A trial court will abuse its discretion by action that is arbitrary or "'that transgresses the confines of the applicable principles of law.'" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393[–394]; see *In re Cortez* (1971) 6 Cal.3d 78, 85.)" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

We apply a similar standard to the juror bias issue. "A trial court's determination concerning juror bias is reviewed for abuse of discretion. (*People v. Abilez* [(2007)] 41 Cal.4th [472,] 497–498.) '[A]ppellate courts recognize that a trial judge who observes and speaks with a

---

[9] Defendants also argue plaintiffs forfeited their appellate arguments because the opening brief fails to discuss the proper standard of review or evidence adverse to plaintiffs. We disagree with defendants' characterization of the opening brief, but even if we agreed, the brief is sufficient for us to exercise our discretion to consider plaintiffs' appellate arguments. (See *Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1258, fn. 12.)

14

prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' (*People v. Stewart* (2004) 33 Cal.4th 425, 451.) As such, 'the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the "definite impression" that he is biased, despite a failure to express clear views.'" (*People v. Jones* (2012) 54 Cal.4th 1, 41.)

III.

ADMISSION OF THE ALCOHOL AND METHAMPHETAMINE EVIDENCE

"""[S]ection 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on 'in forming an opinion *upon the subject to which his testimony relates.*' . . . We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible." [Citation.]' (*Sargon Enterprises, Inc. v. University of Southern Cal.* (2012) 55 Cal.4th 747, 770 (*Sargon*).) 'Thus, under . . . section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion.' (*Ibid.*) "'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." [Citation.]' (*Id.* at p. 771.)" (*David v. Hernandez* (2017) 13 Cal.App.5th 692, 698.)

Plaintiffs' motion in limine sought to exclude all evidence and testimony "referencing Mr. Andrade's purported level of intoxication at the time of the collision that caused his death," including Crabtrey's testimony and all toxicology reports regarding alcohol, amphetamine, and methamphetamine. In support, plaintiffs argued: (1) the toxicology reports constituted case-specific hearsay, inadmissible under *People v. Sanchez*

15

(2016) 63 Cal.4th 665;[10] (2) the toxicology screening results were
"unconfirmed, unreliable, and . . . not in conformity with" *People v. Williams*
(2002) 28 Cal.4th 408, *People v. Harris* (1989) 47 Cal.3d 1047, 1094, and
*People v. Kelly* (1976) 17 Cal.3d 24; (3) Crabtrey's testimony would rely on the
allegedly unconfirmed and unreliable test results; and (4) the evidence would
be irrelevant and more prejudicial than probative. (See §§ 350, 352.)

Plaintiffs filed a single motion in limine addressing both the
alcohol evidence and methamphetamine evidence, and the trial court did not
analyze the two types of evidence separately. A separate analysis provides
helpful clarity.[11]

A. *Alcohol Evidence*

The alcohol testing performed on Andrade's femoral blood and
vitreous samples was reliable enough for the trial court to allow them in, and
the test results were relevant to the defense's theory of the case.

1. Plaintiffs' Gatekeeping Objection

Courts "must . . . be cautious in excluding expert testimony," and
careful not to "weigh an opinion's probative value or substitute its own
opinion for the expert's opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 772.) "The
trial court's gatekeeping role does not involve choosing between competing
expert opinions." (*Ibid*.) The court "must simply determine whether the

---

[10] The trial court rejected this argument, and plaintiffs do not
challenge that ruling on appeal. We therefore do not address the issue.

[11] We reject defendant's suggestion that, because plaintiffs'
motion in limine sought to exclude both the alcohol and the
methamphetamine (and amphetamine) evidence, we cannot address the
admissibility of the two types of evidence separately.

matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Ibid.*)

Here, the trial court properly admitted the evidence concerning Andrade's alcohol levels because the testing upon which Dr. Tanen relied in rendering his testimony was not inherently speculative. It was based on a sample of femoral blood, which he testified constitutes the "gold standard" location from which to extract blood for alcohol testing. Dr. Tanen also testified the vitreous liquid is another "reliable source" for alcohol testing.

Okorocha's opinions did not demonstrate Dr. Tanen's testimony was speculative or unreliable on the issue of alcohol. Rather, Okorocha simply disagreed with Tanen's conclusions and opinions. For instance, Okorocha claimed the test results of Andrade's vitreous liquid were unreliable because the sample was only drawn from one eye and trauma to Andrade's head could have resulted in contamination of the eye. But Dr. Tanen testified he saw no evidence either the femoral blood or vitreous samples would have been affected by the trauma.

Okorocha also opined the phenomena of postmortem fermentation and redistribution called the accuracy of the alcohol test results into question. But Dr. Tanen disagreed with Okorocha's opinion. He explained fermentation would not affect blood alcohol in the eye (and, even in the blood, would produce, at most, a "tiny" difference in blood alcohol content). He also explained "redistribution" did not occur with alcohol and explained why the vitreous fluid sample was potentially even more accurate than a femoral blood sample in measuring the amount of alcohol in a person's system. It was for the jury to decide which of the competing expert opinions to accept.

17

2. Plaintiffs' Section 352 Objection

The alcohol toxicology evidence was directly relevant to the issue of causation, i.e., whether Andrade was under the influence of alcohol and put himself in the path of the moving truck. It supported Officer Belisle's testimony that, on the night of the collision, Rodriguez described Andrade as moving to the left, in front of the tow truck as he tried to drive past Andrade. It also helped explain accident reconstructionist Arst's testimony that Andrade was well inside the tow truck's lane when he was struck. Dr. Tanen testified a person with a blood alcohol level of 0.09 would be *expected* to have problems with balance, gait, coordination, and judgment—all behaviors that are consistent with and could explain Andrade moving toward and into the path of an approaching vehicle. The evidence concerning Andrade's movements just before the collision and his location when he was struck— which the jury was entitled to accept as true—supply the causal link necessary to establish the testimony's relevance. Given the clear probative value of the alcohol test results and the testimony correlating Andrade's alcohol level with its expected effect on Andrade's balance, ability to walk, coordination, and judgment, we find no error in the trial court's conclusion the evidence was not unduly or unfairly prejudicial.

*B. Methamphetamine Evidence*

We reach a different conclusion on the methamphetamine toxicology results and the testimony about them.

The primary problem with the admission of the methamphetamine toxicology results is that there was zero evidence explaining what the test results mean in terms of affecting Andrade's behavior or explaining how the accident came about. In other words, there was no testimony establishing a causal link between the methamphetamine

18

in Andrade's system and the accident. The jury was simply told Andrade had a certain level of methamphetamine (and a certain level of its metabolite, amphetamine) in his body and from there, the jury was left to speculate about whether—if at all—that would be likely to impair Andrade so as to cause him to move in front of Rodriguez's truck.

Indeed, Dr. Tanen—who testified that a blood alcohol level of .090 would be *expected* to impair Andrade's judgment, balance, coordination and ability to walk—said nothing of the kind about the level of methamphetamine found in Andrade's body. The most he could say was that, as an emergency room physician, he "sees" cases in which methamphetamine can cause "agitation, paranoia, hallucinations, [and] violence." But with the possible exception of "hallucinations," it is not apparent how any of those behaviors could have caused or contributed to the collision—and Dr. Tanen did not testify they could. More to the point, Dr. Tanen—who is a specialist in how drugs interact with the human body—did not testify that the level of methamphetamine found in Andrade's blood would typically result in any of those behaviors. Quite the contrary. Dr. Tanen testified the *only* conclusion he could draw from the tested methamphetamine level was simply that methamphetamine was present in Andrade's body; he expressly disclaimed

any ability to draw any conclusion about whether that level of methamphetamine would have affected Andrade's behavior in any way.[12]

Without any evidence linking the level of methamphetamine found in Andrade's body to some kind of impairment, the presence or level of methamphetamine in Andrade's system was irrelevant, and the trial court abused its discretion by admitting the test results and the related expert testimony at trial. (See *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599 ["evidence of marijuana use is irrelevant in the absence of a causal connection between the marijuana use and the accident"]; *David v. Hernandez, supra,* 13 Cal.App.5th at p. 699 [driver's urine test results properly excluded where the test did not show whether the driver had active tetrahydrocannabinol (THC) in his system, and even if it had, "it is speculative whether the amount was sufficient to impair his ability to drive a motor vehicle"].)

The parties devote considerable ink to arguing about whether the methamphetamine found in Andrade's system was of the "legal" or "illegal" variety. Given the absence of any testimony linking the methamphetamine level in Andrade's body to any behavior or impairment from which a jury

---

[12] For this reason, defendants' reliance on *People v. Bui* (2001) 86 Cal.App.4th 1187 is misplaced. In that driving under the influence case, the court of appeal found a toxicology expert was properly permitted to testify to the impairment one would expect to see in someone with a concentration of 0.3 milligrams of methamphetamine and 0.04 milligrams of amphetamine in their blood. (*Id.* at p. 1191.) The expert testified he had conducted and published two studies on the effects of methamphetamine, one of which correlated methamphetamine blood levels to driving impairment. (*Ibid.*) Both were peer-reviewed. (*Id.* at p. 1192.) That is precisely the kind of testimony that is lacking here and that Dr. Tanen testified he could *not* provide with respect to the methamphetamine test results.

could infer Andrade's own conduct caused or substantially contributed to the accident, we cannot see why the distinction has any relevance.

We recognize that, in support of plaintiffs' motion in limine, Okorocha provided a declaration stating that only the illegal form of methamphetamine could cause "psychoactive" effects. But although Okorocha criticized at trial the methamphetamine toxicology testing because it did not differentiate between the two types of methamphetamine—and although he testified at trial the version of methamphetamine found in over-the-counter medications "doesn't have the [e]ffects that the street drug does"—he never explained to the jury what the difference in effect was. Thus, the jury was provided no evidence from which it could conclude that the type of methamphetamine that produced Andrade's toxicology result made any difference to any issue it was asked to decide.

Dr. Tanen's testimony also did nothing to explain why the difference might matter. The most he could say was all the patients he has ever seen who ended up in his emergency room with methamphetamine in their system had ingested the illegal form of methamphetamine. Presumably, this was intended to suggest Andrade must have ingested illegal methamphetamine. But that is pure speculation. Likewise, Dr. Tanen's testimony that a particular brand of asthma inhaler containing methamphetamine has, for 10 years, had 60% less methamphetamine than it had previously says nothing about what kind of methamphetamine was present in Andrade's body (or why the type of methamphetamine even mattered) or how the tested level of 0.838 milligrams had any bearing on

21

whether Andrade was so impaired by methamphetamine that he walked, stumbled, or otherwise moved into the path of Rodriguez's truck.[13]

On these facts, admitting the methamphetamine toxicology results and the testimony concerning them was an abuse of discretion.

*C. Admission of the Methamphetamine Evidence Was Not Prejudicial*

Having concluded admission of the methamphetamine evidence was error, we turn to whether the error compels reversal. We conclude it does not.

It is axiomatic we will not reverse a judgment based solely on error; the error must be prejudicial to the appealing party such that it causes a miscarriage of justice. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) "To establish prejudice, a party must show 'a reasonable probability that in the absence of the error, a result more favorable to [it] would have been reached.'" (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1161.) "'[A] "probability" in this context does not mean more likely than not, but

---

[13] Dr. Tanen testified vaguely that combining alcohol and methamphetamine "make[s] things worse." In explaining that statement, he testified that, in his experience in the emergency room, people abusing methamphetamine typically also use alcohol and the combination produces the same effects he had identified in his patients that present with methamphetamine: "[T]he combination when we see the patients in the emergency department are often paranoid, agitated, aggressive, um, sometimes hallucinating, often not cooperating with police or family who brought them in." But, again, Dr. Tanen offered no opinion on how—or even whether—the level of methamphetamine found in Andrade's body would be expected to interact with the identified level of alcohol to affect Andrade's behavior in any way that would be likely to cause or substantially contribute to the accident. Notably, he did not testify the presence of methamphetamine (either in any amount or in the tested amount) would be expected to exacerbate the behavioral effects of alcohol that he had already identified, i.e., "poor decision making, trouble walking, trouble with balance," and trouble with "coordination."

merely a *reasonable chance*, more than an *abstract possibility*.' (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

We conclude the admission of the methamphetamine evidence caused no miscarriage of justice because the jury had sufficient evidence to find Andrade was likely impaired by alcohol in ways that established a causal link between the impairment and the accident. Dr. Tanen and Crabtrey properly testified to the levels of alcohol found in Andrade's femoral blood and vitreous samples. Dr. Tanen explained why these levels were accurate and a reliable indicator of Andrade's antemortem alcohol level. He also explained the expected effects of such levels of alcohol on human behavior. Based on the totality of the evidence—including the accident reconstructionist's opinion that Andrade was several feet inside the truck's lane when he was hit and Rodriguez's on-the-scene statement to Officer Belisle[14]—we conclude plaintiffs have not shown that, absent the methamphetamine evidence, there was a reasonable probability the jury would have come to a result more favorable to them.

---

[14] It is clear the jury credited the testimony Andrade was inside the truck's lane when he was struck; had it credited the opinion by plaintiff's accident reconstructionist that Andrade was outside the fog line, it necessarily would have found the driver negligently veered outside his lane to strike Andrade on the shoulder of the road.

## IV.

### PLAINTIFFS' FOR CAUSE CHALLENGE TO POTENTIAL JUROR NO. 12

Finally, plaintiffs contend the trial court committed reversible error by denying their for cause challenge to Prospective Juror No. 12 (PJ12). We disagree.

"'"'"Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]"' [Citations.]' (*People v. Lancaster* (2007) 41 Cal.4th 50, 78–79) 'Indeed, where answers given on voir dire are equivocal or conflicting, the trial court's assessment of the person's state of mind is generally binding on appeal. [Citation.] The trial court is in the unique position of assessing demeanor, tone, and credibility firsthand—factors of "critical importance in assessing the attitude and qualifications of potential jurors.' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 656–657.) Even if potential jurors make statements which might tend to cast doubt on their ability to remain impartial, there is no abuse of discretion unless the jurors "'express[] views indicative of an unalterable preference'" in favor of one side or the other. (See *Alcaraz v. Los Angeles Unified School Dist.* (2018) 29 Cal.App.5th 86, 100.)

In ruling on plaintiffs' challenge to PJ12, the trial court was, at most, confronted with conflicting or equivocal comments by PJ12, as shown by the following:

In response to the court's initial voir dire, PJ12 stated that, having listened to all the prior voir dire of other potential jurors, she had no concern she "might be biased or prejudiced for or against either party in this case." She confirmed she had no concern about her ability to deliberate as a group, withstand group pressure, and withhold judgment until the end of the trial, after the jury was sent to deliberate. PJ12 told the court, without reservation, she "can be a fair judge of the facts."

PJ12 was then questioned by plaintiffs' counsel. She was asked, "how [do] you feel about the pedestrian issue? Pedestrians always have the right of way? Pedestrians are protected too much?" In response, PJ12 said she felt pedestrians are "a little too overprotected regardless of what the law says" and suggested she "might not follow the law" because "[j]ust because the law says this is allowable by somebody doesn't mean to me that they should be excused." Asked if she would "follow Your Honor's law," she responded "if the law says pedestrians have the right of way at all times, if I

25

don't agree with the law, I would have a hard time. So maybe my answer is, no, that I could not do that, but, um—"[15]

At that point, it appears plaintiffs' counsel interrupted PJ12's answer to ask if she was "favoring the defense on this side just because there's a pedestrian involved"—to which PJ12 responded, "No, I would not say that." She followed that up by saying, "this is really a crappy situation. I don't know which side I had favored, and I'm probably a little bit more toward the defendant, um, because I feel like there's just way too much freedom for pedestrians in this state, and I think that's what this is becoming about, um, but I would wait to hear the facts, yes." PJ12 then stated she could determine relative fault by the parties and was willing and able "to keep an open mind, talk with the other jurors and make decisions about whether there may be somebody who broke the law or what the percentages [of fault] are." The questioning by plaintiffs' counsel ended with PJ12's unqualified statement, "I do think I can be a fair juror."

PJ12's responses to questioning by defendants' counsel were also unequivocal, as reflected in the following exchange:

"[Counsel]: [PJ12] I know you have opinions regarding pedestrians, I listened to those. Thank you for sharing that. My question is

_____

[15] In ruling later on plaintiffs' for cause challenge to PJ12, the court took issue with some of this questioning by their counsel, stating counsel had "kind of cut [PJ12] off and I don't think she understood." The court agreed with defense counsel's argument that PJ12 ultimately was "pretty unequivocal" that she would follow the court's instructions, and the court then stated to plaintiffs' counsel: "She clearly didn't understand the question, and the way you phrased that question is confusing because she didn't know what the law is, and so everyone will have their own opinion but, of course, pedestrians can't walk wherever they want. We all feel that way, but that is not the law."

going to be a little different. You are going to be given instructions on the law as to when somebody's at fault, right, the pedestrian, the driver, and you are going to get those instructions from Her Honor. Can you follow that law as instructed even if you might disagree with it and you have this preconceived notion of pedestrians are always wrong?

"[PJ12]: Yes. I don't want to but, yes.

"[Counsel]: In other words, can you set aside that opinion that you have about pedestrians and follow the law as instructed and simply apply that law?

"[PJ12]: Yes.

"[Counsel]: As much as you don't want to. I understand it might be difficult, but you can, and you will do that in this case?

"[PJ12]: Yes."

Plaintiffs' counsel challenged PJ12 for cause, arguing she had indicated she "can't follow what the law is that the [c]ourt is going to give her." The trial court denied the challenge, stating its belief that PJ12 had not understood some of the questions, some of which had been confusing. In any event, the court concluded the juror had not expressed an "inability to be fair and impartial."

Based on the totality of the voir dire questions and responses, and in light of the broad discretion we accord trial judges confronted with conflicting or equivocal voir dire responses by potential jurors, we cannot say the court abused its discretion by denying plaintiffs' request to excuse PJ12 for cause. At most, the court was faced with some conflicting or confusing answers by PJ12 and weighed them against some unequivocal assurances by PJ12 that she could and would follow the law given to her and be fair. As noted above, we will not disturb the trial court's resolution of conflicting or

27

equivocal responses or its conclusion PJ12 was able and willing to follow the law and be fair and impartial.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs on appeal.

GOODING, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

DELANEY, J.